In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2422

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

FANY MORENO,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 499-2--William T. Hart, Judge.


Argued May 9, 2000--Decided November 6, 2000


  Before MANION, KANNE, and ROVNER, Circuit Judges.

  ROVNER, Circuit Judge.  Shortly after her
significant other, Evaristo Moreno, pleaded
guilty to possessing both heroin and cocaine with
the intent to distribute these narcotics, a jury
convicted Fany Moreno ("Moreno") of these same
crimes; and she is currently serving a prison
term of six and one-half years./1 Moreno now
appeals her conviction. She contends that the
prosecution was improperly permitted to elicit
the fact that her partner initially consented to
a search of their home but then withdrew his
consent after she said something to him (we do
not know what) in Spanish. Moreno characterizes
the testimony that Mr. Moreno granted, and then
withdrew, his consent, as inadmissible hearsay.
We believe that Mr. Moreno's statements were
verbal acts, although we share Moreno's doubts
about their probative value. Any error in
admitting the statements was, however, harmless.
We therefore affirm Moreno's conviction.

I.

  The Morenos had the misfortune to conduct a
suspicious transaction within view of members of
a U.S. Customs Service task force that happened
to be conducting an unrelated investigation. On
July 9, 1998, six agents were conducting
surveillance on Chicago's northwest side when one
of them noticed the Morenos' Chevrolet pull into

the parking lot of a nearby 7-Eleven convenience store. Evaristo Moreno was driving, Fany Moreno was in the front passenger seat, and their nine year-old son was in the back seat. Ms. Moreno got out of the car, stood in front of the 7-Eleven for a moment, returned to the auto and spoke with Mr. Moreno, and then resumed her station in front of the store. A Jeep subsequently pulled into the parking lot, an unidentified man stepped from it, and he handed Moreno a small white plastic bag. She accepted the bag, quickly returned to the Chevrolet, and the Morenos left the lot.

Their suspicions aroused, several members of the task force followed the Morenos and eventually pulled their car over after Evaristo Moreno drove through a red light. As Mr. Moreno got out of the car and approached Agent Vince Scaccianoce, Moreno herself exited the vehicle with two bags in hand, one of them the small bag that she had collected at the 7-Eleven. The agent asked her to return to the car and she complied. Subsequently, after Mr. Moreno had consented to a search of the car, Moreno again left the vehicle, again with the two bags in hand. Agent Daniel Morro instructed her to leave the bags in the car. When he asked her what was in the smaller bag, Moreno claimed not to know. When Morro looked into the bag, he discovered a Nike shoe box containing a large amount of cash--some $69,000. (Inside of the larger bag were recently purchased child's clothing and a pillow.)/2

As it turned out, the agents had stopped the Morenos within a block of their home. After the car was searched, Agent Scaccianoce solicited Mr. Moreno's consent to search the home and he gave it. However, as he and some of the agents began to walk toward the house, Ms. Moreno yelled something in Spanish to her partner that none of the agents managed to catch. Mr. Moreno promptly withdrew his consent to a search of the house, and the agents were forced to obtain a warrant.

Warrant in hand, the agents returned later that evening and searched the house. In a master bedroom closet, which contained clothing and shoes for both men and women, they found nearly a kilogram of cocaine inside of a purse, along with the stubs of three movie tickets (two for adults and one for a child) and a variety of other documents (year-old receipts and a lottery ticket). In the same closet, some twenty-one baggies containing small amounts of cocaine were discovered in a stuffed-animal knapsack and a number of shoe boxes. Some $27,000 in U.S. currency was also found in a fanny pack. The bills in that pack, like the much larger amount found in the bag that Moreno accepted at the 7-Eleven, were bundled together in a manner and

comprised of denominations typical of drug trafficking funds. A dresser in the master bedroom, which, like the closet, contained masculine and feminine clothing as well as a utility bill addressed to Fany Moreno and several other pieces of correspondence, yielded more cocaine (packaged in glycine and plastic baggies, some stashed in film canisters, others in socks), two digital gram scales, and inositol, a baby laxative that people in the drug trade often use as a cutting agent. All told, the search yielded 1,690.5 grams of cocaine. In addition, the agents discovered just over 260 grams of heroin in a living room closet, secreted within a box that once contained an Asteroid Air Blasters toy. The total retail value of the drugs found in the home exceeded $200,000.

Although Evaristo Moreno pleaded guilty to the two-count indictment, Fany Moreno, whom no witness had ever seen purchase or sell narcotics, opted for a trial. Her defense was that she was unaware of her partner's narcotics trafficking and, at most, was an unwitting accomplice to it. To meet that defense, the government was permitted, over Moreno's objection, to elicit testimony from several agents that Evaristo Moreno had at first consented to a search of their home and then, after the defendant yelled something in Spanish to him, had withdrawn his consent. E.g., Tr. 76, 95-96, 186-87. Although no one (other than Fany Moreno and Evaristo Moreno) knows what she yelled to him, in the government's view one may reasonably infer that she in some way urged him not to permit the search; that inference reasonably suggests in turn that Moreno knew about the narcotics in their house. The government pursued this theme forcefully in its closing arguments:

At this point, what happens? Fanny [sic] Moreno begins to yell. She begins to yell loudly in Spanish. Do we know what she says? Emphatically we do not. No one there who was able to hear her knows what she said.

But interestingly, what happens next, ladies and gentlem[e]n? Right after Fanny [sic] Moreno begins to yell at her husband, begins to yell at Evaristo Moreno, who was about to let the agents in the house, he turns around and says, "You can't come in. You have to get a warrant."[/3]

Again, is that consistent with someone with no knowledge? Is that consistent with someone who has nothing that she's aware of that's in the house that she possessed, that she controls? Absolutely not.

Tr. 244; see also Tr. 261-63.

II.

Moreno's appeal focuses on the admission of testimony regarding Evaristo Moreno's initial consent to the search of their home and the withdrawal of that consent upon the heels of her yelled remark to him. She contends that Evaristo's out-of-court statements constitute hearsay, so that it was improper for the government to elicit his change of heart about the search, in conjunction with her own shouted comment to him, as proof of her knowledge that the home contained narcotics.

We agree with the government that Mr. Moreno's utterance of consent to the search, and his subsequent retraction, amount to verbal acts, and as such are not inadmissible hearsay. Like the classic examples of verbal acts, offer and acceptance, see Hydrite Chem. Co. v. Calumet Lubricants Co., 47 F.3d 887, 892 (7th Cir. 1995), statements that grant or withhold permission to the authorities to conduct a search carry legal significance independent of the assertive content of the words used. See generally 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence, sec. 385 (2d ed. 1994); see also, e.g., United States v. Rojas, 53 F.3d 1212, 1216 (11th Cir.) (consent to exercise of jurisdiction over vessel), cert. denied, 516 U.S. 976, 116 S. Ct. 478 (1995); State v. Welker, 536 So.2d 1017, 1019-20 (Fla. 1988) (consent to record telephone conversation); State v. Gillespie, 569 P.2d 1174, 1175 (Wash. App. 1977) (consent to search residence). In appropriate circumstances, therefore, the government may elicit the giving or refusal of one's consent to a search without running afoul of the proscription against hearsay.

That said, we are skeptical that Mr. Moreno's decision to grant or withhold his consent to the search had much, if any, probative value vis a vis Ms. Moreno's culpable knowledge of the drugs in the house. The government's theory as to the relevance of Mr. Moreno's statements depends on the assumption that Fany Moreno instructed or encouraged Evaristo not to let the agents search the house. Certainly it is possible that she did, but it is also possible that she said something entirely different--"If you've committed a crime, I'll never forgive you!", for example. Even if Moreno did say something that encouraged her partner to reconsider his decision to permit the search, the remark did not necessarily reflect guilt on her part. Perhaps she simply reminded him that he had a right to insist on a warrant, as any competent attorney might have done. See United States v. Prescott, 581 F.2d 1343, 1352

(9th Cir. 1978) ("Because the right to refuse entry when the officer does not have a warrant is equally available to the innocent and the guilty, just as is the right to remain silent, the refusal is as "ambiguous" as the silence was held to be in United States v. Hale, 1975, 422 U.S. 171, 176-77, 95 S. Ct. 2133, 45 L. Ed. 99.") The truth is, we can only speculate as to the nature of Ms. Moreno's remark, and that being the case, the fact that Mr. Moreno withdrew his consent to the search immediately after she shouted that remark was of little probative value.

Furthermore, even if we indulge the inference that Moreno urged Evaristo not to allow the search, admitting this evidence as a means of establishing Moreno's guilt may have run afoul of her constitutional rights. Doyle v. Ohio, 426 U.S. 610, 96 S. Ct. 2240 (1976), and Griffin v. California, 380 U.S. 609, 85 S. Ct. 1229 (1965), forbid the government from pointing to a defendant's post-arrest silence, or to his invocation of his Fifth Amendment privilege not to testify, as evidence of his guilt. In reliance on Griffin and Doyle, other courts have either held or suggested that the government may not cite a defendant's refusal to consent to a search of his home as evidence that he knew the search would produce incriminating evidence. See United States v. Dozal, 173 F.3d 787, 794 (10th Cir. 1999); United States v. Thame, 846 F.2d 200, 206-07 (3d Cir.), cert. denied, 488 U.S. 928, 109 S. Ct. 314 (1988); Prescott, 581 F.2d at 1350-52; United States v. Taxe, 540 F.2d 961, 969 (9th Cir. 1976), cert. denied, 429 U.S. 1040, 97 S. Ct. 737 (1977); United States v. Turner, 39 M.J. 259, 262 (C.M.A. 1994); State v. Palenkas, 933 P.2d 1269 (Ariz. App. 1996), cert. denied, 521 U.S. 1120, 117 S. Ct. 2513 (1997); State v. Jennings, 430 S.E.2d 188, 200 (N.C.), cert. denied, 510 U.S. 1028, 114 S. Ct. 644 (1993); Simmons v. State, 419 S.E.2d 225, 226-27 (S.C. 1992); see also United States v. Hyppolite, 65 F.3d 1151, 1157 (4th Cir. 1995) (mere assertion of constitutional right to refuse consent to search does not supply probable cause to search), cert. denied, 517 U.S. 1162, 116 S. Ct. 1558 (1996); United States v. Taxacher, 902 F.2d 867, 873 n.6 (11th Cir. 1990) (same), cert. denied, 499 U.S. 919, 111 S. Ct. 1307 (1991); Snow v. State, 578 A.2d 816, 825 (Md. App. 1990) (driver's refusal to consent to search of automobile did not give rise to reasonable suspicion that vehicle contained narcotics); cf. United States v. McNatt, 931 F.2d 251, 257-58 (4th Cir. 1991) (evidence of defendant's refusal to consent to search was admissible to respond to defendant's claim that police planted evidence), cert. denied, 502 U.S. 1035, 112 S. Ct. 879 (1992). The Fourth Amendment entitled the Morenos to withhold their consent to

the search, and so to have held up Mr. Moreno's invocation of that right, purportedly at his partner's urging, as evidence that Ms. Moreno knew the house contained contraband, may have been inconsistent with due process.

   We are satisfied, however, that any error in the admission of this evidence was harmless. The agents had witnessed Moreno accept a bag filled with $69,000 in cash in front of the 7-Eleven, while Evaristo waited nearby in the car. When the agents subsequently stopped the Morenos, Ms. Moreno twice attempted to take that bag with her when she left the car, a circumstance that suggests she had some idea of what the bag contained. Moreover, when the Moreno home was searched, drugs and drug paraphernalia were found throughout the house, in places where Ms. Moreno almost certainly would have seen them: more than a kilogram of cocaine was found in the master bedroom closet, which contained both men's and women's clothing, and much of the cocaine was found in a purse along with the movie ticket stubs and various receipts. Additional cocaine, together with two digital gram scales and the inositol, was discovered in the master bedroom dresser, along with a bill addressed to Fany Moreno. Finally, more than 260 grams of heroin were found within a toy box in a living room closet. Under these circumstances, it strains credulity to argue, as Moreno does, that she was at most an unwitting participant in Evaristo Moreno's drug trafficking.

III.

   Although we agree with Moreno that the testimony concerning her significant other's decision to withdraw his consent to a search of their home probably should not have been admitted, we find any error to have been harmless in this case. We therefore AFFIRM her conviction.


/1 Although Evaristo and Fany Moreno had lived together for eleven years, and were referred to as husband and wife at trial, they were not married; they simply happened to have the same last name.

/2 No issue is raised as to the scope of the automobile search to which Mr. Moreno consented. See Florida v. Jimeno, 500 U.S. 248, 111 S. Ct. 1801 (1991).

/3  As Moreno points out, the record does not actually establish precisely what Mr. Moreno said when he withdrew his consent. The agents simply testified that he withdrew his consent. See Tr.

96, 187.