2015 IL App (2d) 131106
No. 2-13-1106
Opinion filed December 29, 2015

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 06-CF-4866 |
| | ) ) | Honorable |
| JAMES EALY, | ) ) | Fred Foreman and Daniel Shanes, |
| Defendant-Appellant. | ) | Judges, Presiding. |

_____

JUSTICE BURKE delivered the judgment of the court, with opinion.
Justices Hutchinson and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1     A jury found defendant, James Ealy, guilty of first-degree murder, and the trial court sentenced him to a term of natural life imprisonment. On appeal, defendant argues that he is entitled to a new trial due to the cumulative prejudice of three trial errors: (1) the admission of evidence that, unlike several other people whom the police interviewed, defendant refused to consent to DNA testing, and the State's argument to the jury that his refusal showed consciousness of guilt; (2) the exclusion of evidence that, like defendant, other residents of his apartment complex paid rent in installments each month; and (3) the State's closing argument that an acquittal based on the absence of fingerprints or DNA evidence would improperly

"reward" defendant. Defendant also argues that a new trial is necessary because the jury returned inconsistent verdicts in finding him guilty of intentional murder and not guilty of knowing murder.

¶ 2 The State denies any trial error. Alternatively, the State argues that (1) defendant forfeited his challenge to the admissibility of his refusal of DNA testing and (2) "any alleged evidentiary errors and instances of prosecutorial misconduct did not rise to cumulative error."

¶ 3 We hold that (1) defendant preserved his challenge to the admissibility of his refusal of DNA testing; (2) the trial court abused its discretion in admitting the evidence of the refusal and allowing the State to argue that it showed consciousness of guilt; (3) the court did not abuse its discretion in excluding evidence that other residents of the apartment complex paid rent as defendant had; (4) the State's argument that the jury should not "reward" defendant for the absence of fingerprints or DNA evidence was not prosecutorial misconduct; and (5) the admittedly inconsistent verdicts do not warrant a new trial. The State produced overwhelming evidence of defendant's guilt such that any trial error was harmless beyond a reasonable doubt. We affirm.

¶ 4 I. BACKGROUND

¶ 5 Mary Hutchinson's body was found on the floor of her office at the Burger King restaurant in Lindenhurst at 5:10 a.m. on November 27, 2006. Hutchinson died from strangulation and stab wounds inflicted by a flat-head screwdriver. The safe in her office was found open and empty. A large screwdriver that employees had used to disengage the locking mechanism of the main entry doors was missing from the office. A few days after the incident, a search of defendant's home disclosed cash, and he was charged with the murder. Defendant

knew the victim from his time working at the Burger King from July 26, 2005, to October 25, 2006.

¶ 6     On the date of the incident, Hutchinson, a manager, had been authorized to come in early to complete her monthly inventory check. The restaurant's records showed that the alarm had been deactivated just before 4 a.m., and an audit of the safe showed that it had most recently been opened at 4:23 a.m. A cash report from the night before showed that the safe was missing $236 in 1-dollar bills, $645 in 5-dollar bills, $410 in 10-dollar bills, and $300 in 20-dollar bills. Also missing were $40 in dimes and $70 in quarters.

¶ 7     The Lake County Major Crimes Task Force took charge of the investigation and began interviewing current and former employees of the Burger King. George Filenko, the commander of the task force, and Detectives Viramontes and Lambie were responsible for interviewing defendant.

¶ 8     Filenko, Viramontes, and Lambie went to defendant's apartment at 8:30 p.m. on the date of the incident. According to Filenko, defendant invited the officers inside and said that he had heard about Hutchinson's death from a friend. Defendant agreed to go to the Lindenhurst police station for further questioning.

¶ 9     At the station, defendant told Filenko and Lambie that he was working at McDonald's but quit his second job at Burger King to start working at Value City, where he received higher pay. Defendant regularly worked at McDonald's from 10 p.m. to 6 a.m., Monday through Thursday. Defendant worked a similar shift on Sunday nights, usually leaving at 4 a.m.

¶ 10     Defendant told Filenko that, on Monday, November 27, 2006, defendant left McDonald's at 4:01 a.m. and drove to the Lake Villa post office. Filenko testified that defendant said he arrived at the post office at 4:17 a.m. and then drove home to take a nap until 5:45 a.m. before

going to work at Value City. To refute defendant's account of events, the State introduced evidence at trial that he was at a White Hen convenience store in Lindenhurst a short time after the offense. Steve Schwaller, a manager of the White Hen, testified that he saw defendant in his store about 4:42 a.m. Defendant walked in and stared at Schwaller for a few seconds without responding to his greeting. After seeing a police officer reading a newspaper inside the store, defendant picked up a candy bar and brought it to the counter. A receipt for the purchase was time stamped at 4:42 a.m.

¶ 11    Continuing the interview at the station, defendant told Filenko that he and Hutchinson were friends and that she had told him about an armed robbery she had endured while working at a Burger King in Antioch. According to Filenko, defendant said that Hutchinson had brought up the possibility of defendant acting as her bodyguard while he worked at Burger King. Defendant left the station when he said he would be late for work, and the interview ended.

¶ 12    At Filenko's request, defendant returned to the station the next day. Defendant appeared agitated and upset that the media had been filming at his apartment the previous night. Filenko took defendant to the area of the station where the police were collecting fingerprints and DNA samples from several current and former employees of the Burger King.

¶ 13    Over defense objection, Filenko testified that defendant refused to give the police a sample of his DNA. Officer Ralph Goar, an evidence technician, testified that, on November 28, 2006, he collected palm prints and fingerprints from 22 current and former employees, including defendant. When Goar asked defendant for a DNA sample, "he was adamant and actually appeared to be agitated about even being asked to take his DNA samples." Goar testified that the other 21 people gave DNA samples. The next day, Goar collected fingerprints and DNA

samples from nine more current or former employees. Two days later, the police obtained a search warrant and collected samples of defendant's DNA.

¶ 14     Evidence such as fingerprints and swabs of possible bodily fluid were collected from the crime scene, analyzed, and compared to the fingerprints and DNA from defendant and the other current and former employees. None of the evidence from the scene provided relevant identification information.

¶ 15     Phone records showed that the Burger King received two calls about 4:23 a.m. on the date of the incident. Both calls were from the number that defendant had given to the police as his cell phone number. Records showed that the caller dialed "*67" before each call, meaning that the caller's phone number would be blocked on the receiver's caller identification feature. Filenko testified that, during his interview, defendant did not mention calling the Burger King.

¶ 16     The police set up a team to watch defendant while he was at work. Three days after the murder, at 5:45 a.m. on November 30, 2006, defendant left the McDonald's and began driving west, at which point the surveillance team stopped and arrested him. The surveillance team detained defendant at the Round Lake Park police station while other officers executed a warrant to search his home.

¶ 17     The search disclosed a bundle of cash hidden between the inner and outer linings of a full-length leather jacket. The jacket was in defendant's bedroom closet. The cash was in a white plastic bag and accessible through a hole in the jacket's pocket. Forensic testing revealed that the bag contained three latent fingerprints from defendant's left hand. The cash was $286 in 1-dollar bills, $550 in 5-dollar bills, and $180 in 10-dollar bills, with each denomination grouped and the groups ordered sequentially. The search also disclosed a pillow case filled with $70 in

quarters and $40 in dimes, which matched the denominations and numbers of coins reported missing from the safe.

¶ 18    About 3:30 p.m. on December 1, 2006, four detectives transferred defendant from the Round Lake Park police station to the Criminal Investigations Division in Waukegan. During the drive, defendant sat handcuffed between two detectives in the back seat. According to one of the detectives, defendant began speaking, unprompted. Defendant said he had a "f*** up feeling" and began to cry. The detective wiped defendant's tears. Defendant said that nothing good should happen to him, "because of the evil" in him. Defendant also spoke generally about his wife and how the news would affect her.

¶ 19    At the Criminal Investigations Division, defendant was placed in an interview room with audio and video recording equipment. Defendant was advised of his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)), and he invoked his right to counsel. The trial court determined, however, that defendant reinitiated conversation with two detectives while he was confined in the room. The recording from that period is largely inaudible but there is some discussion of morality, good versus evil, and karma. The interaction between defendant and the detectives appears generally cordial.

¶ 20    One portion of the recording shows a detective asking defendant if he needed to use the restroom, because it would be locked soon. The detective testified that, while defendant was washing his hands off-camera, he said, "[y]ou, your partner, and God Almighty know what I did." Defendant also said, "[y]ou in your heart know what I did, and I just wanted to tell you and your partner that." Two other officers who accompanied defendant to the restroom corroborated the testimony about these statements. Once charges against defendant were approved, defendant

was taken to the booking area. He inquired whether the detectives would speak to the victim's husband and asked, "[w]ill you tell Mary's husband I am sorry for what I did?"

¶ 21    The State argued that defendant committed the offense for financial gain, and it introduced evidence of defendant's financial situation to establish his motive. Michael Stumpp, one of defendant's friends, testified that defendant had asked to borrow $500 near the end of October 2006. Stumpp loaned defendant $300, which was all he had, and defendant promised repayment in February.

¶ 22    James McDonald, the property manager at defendant's apartment complex, testified that defendant often paid rent in installments throughout the month. Defendant made three payments in August 2006, four payments in September 2006, three payments in October 2006, and three payments in November 2006. On cross-examination, McDonald stated that he was "working with" defendant and never charged him a late fee, to ensure he could pay rent each month. The trial court barred the defense from eliciting evidence that almost all the other tenants in the complex paid rent under similar payment arrangements.

¶ 23    The State began its first closing argument by commenting on the absence of incriminating fingerprints or DNA at the crime scene. The trial court overruled defense counsel's timely objection. The prosecution opened by stating, "well, it's reward time, Ladies and Gentlemen" and continued as follows:

> "That's right, it's reward time, or at least it's reward time if you listen to the defense.
>
> The reason it's reward time, according to them, is because if a defendant is either smart enough or lucky enough not to leave his fingerprints at a crime scene, then according to them the defendant gets found not guilty.

* * *

And if the defendant is either smart enough or lucky enough to not leave his DNA behind at a crime scene, then according to them the defendant gets found not guilty.

Now understand, that is not what the law is. Not once when Judge Shanes reads you the jury instructions is he going to tell you that if the defendant's fingerprints aren't at the crime scene that you have to find him not guilty.

Not once is Judge Shanes going to tell you that if the defendant's DNA is not at the crime scene that you have to find the defendant not guilty, and the reason the judge is not going to instruct you on that is because that is not the law, and the reason that is not the law is because the law does not reward criminals for doing their jobs too well. The law does not reward criminals for doing their jobs too well."

¶ 24    The jury received separate verdict forms for intentional murder and knowing murder, as well as forms for whether the State proved that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and whether the murdered individual was killed during the course of another felony, robbery. After the initial deliberations, the jury returned only three of the four verdict sets. The trial court inquired about the discrepancy, and the foreperson admitted the oversight. After further deliberations, the jury returned all the verdict forms, finding (1) defendant not guilty of knowing murder, (2) defendant guilty of intentional murder, (3) that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, and (4) that the murdered person was killed in the course of another felony.

¶ 25 On October 9, 2013, the trial court sentenced defendant to natural life imprisonment. Defendant filed a motion to reconsider the sentence, which was denied on October 17, 2013. Defendant filed a timely notice of appeal the same day.

¶ 26                                II. ANALYSIS

¶ 27                                A. Trial Error

¶ 28 On appeal, defendant argues that he was prejudiced by three trial errors: (1) the admission of evidence that, unlike several other people whom the police interviewed, defendant refused to consent to DNA testing, and the State's argument to the jury that his refusal showed consciousness of guilt; (2) the exclusion of evidence that, like defendant, other residents of his apartment complex paid monthly rent in installments; and (3) the State's closing argument that an acquittal based on the absence of fingerprints or DNA evidence would improperly "reward" defendant.

¶ 29                           1. Refusal of DNA Testing

¶ 30 As part of its investigation, the task force interviewed 31 current and former Burger King employees, including defendant. The police asked each interviewee to voluntarily submit fingerprints and a DNA sample for comparison to any fingerprints and DNA that might be discovered at the crime scene. Defendant voluntarily provided fingerprints but refused to submit a DNA sample. The other 30 interviewees consented to providing both.

¶ 31 Defendant argues on appeal that he was "unduly prejudiced by the State's use of his refusal to consent to a collection of his DNA, and by the State's subsequent argument that the refusal was evidence of his guilt." In support of his claim, defendant quotes *People v. Eghan*, 344 Ill. App. 3d 301 (2003), for the proposition that a ruling is improper when it "permits a jury

to infer consciousness of guilt from the defendant's exercise of his rights." *Eghan*, 344 Ill. App. 3d at 310.

¶ 32    Generally, evidence is admissible if it is relevant. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice" or if another rule of evidence excludes the evidence. Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 33    A trial court has discretion to determine whether evidence is relevant and admissible, and therefore an evidentiary ruling will not be overturned unless it is arbitrary, fanciful, or unreasonable. *People v. Hanson*, 238 Ill. 2d 74, 101 (2010). A court may exercise its discretion and exclude evidence, even if it is relevant, if the danger of unfair prejudice substantially outweighs its probative value. *Hanson*, 238 Ill. 2d at 102.

¶ 34    A compelled DNA extraction undeniably constitutes a search under the fourth amendment to the federal constitution (U.S. Const., amend. IV) and the search-and-seizure provision of the Illinois Constitution (Ill. Const. 1970, art. I, § 6) and, as such, generally requires a warrant due to the inherent interest an individual possesses in his privacy and bodily integrity. *People v. Garvin*, 219 Ill. 2d 104, 117 (2006).

¶ 35    At the time of defendant's interview, the police had no warrant to compel extraction of his DNA. Two days later, the police obtained and executed a warrant to collect his DNA, but the State does not argue on appeal that such a search would have been supported by probable cause when he initially refused the testing. At the time of his refusal, defendant had no legal obligation to provide his DNA, and voluntary consent would have been the only lawful basis for collecting

it. However, the State argued to the jury that defendant's refusal to submit to DNA testing showed his consciousness of guilt, and to drive home the point, it emphasized that every other interviewee had given a DNA sample voluntarily.

¶ 36                                    a. Forfeiture

¶ 37    The State argues that defendant has forfeited his appellate argument that the introduction of his refusal to consent to DNA testing was unduly prejudicial because it allowed the jury to infer his consciousness of guilt from his exercise of his rights. Anticipating the State's forfeiture claim, defendant argues that he has preserved the issue, and if not, that we may consider it under the plain-error doctrine.

¶ 38    At trial, defendant objected to Filenko's testimony regarding his refusal to consent to DNA testing. Defense counsel explained to the trial court that defendant had refused the testing because the State already had his DNA profile from his prior incarceration for an unrelated crime. Noting a previous ruling that defendant's criminal history had been deemed inadmissible, defense counsel argued that articulating the reason for the refusal would disclose defendant's criminal history to the jury and unduly prejudice him. The court acknowledged defendant's strategic "predicament" but allowed the testimony regarding his refusal and the other interviewees' acquiescence to DNA testing.

¶ 39    In his posttrial motion, defendant argued that the prosecution gave the false impression that defendant somehow prevented the police from obtaining his DNA. The motion cited the prosecution's opening statement that defendant said "you're not getting my DNA" and testimony by Filenko and Goar that defendant "refused" to provide a DNA sample.

¶ 40    The State contends that defendant forfeited his appellate argument because (1) counsel did not object during opening statements when the prosecution mentioned defendant's refusal,

(2) counsel did not "object to the relevance of the refusal, its constitutional implications, or to the similar examination questions posed to Goar," and (3) counsel did not object to the prosecution's closing argument that the refusal showed defendant's consciousness that he killed the victim and that he did not want to help confirm that his DNA was on her body. The State distinguishes defendant's appellate argument from his trial objection that the State misstated the evidence and prevented him from adducing the rationale for his refusal.

¶ 41 Both an objection at trial and raising the issue in a posttrial motion are necessary to preserve the issue for appellate review. *People v. Herron*, 215 Ill. 2d 167, 175 (2005). "A specific objection at trial forfeits all grounds not specified." *People v. Lovejoy*, 235 Ill. 2d 97, 148 (2009). However, "[a]n issue raised by a litigant on appeal does not have to be identical to the objection raised at trial, and we will not find that a claim has been forfeited when it is clear that the trial court had the opportunity to review the same essential claim." *Lovejoy*, 235 Ill. 2d at 148.

¶ 42 We conclude that defendant preserved the issue for review, as he repeatedly and consistently challenged as unduly prejudicial the evidence that he refused to consent to DNA testing, arguing that its probative value was substantially outweighed by the danger of unfair prejudice. See Ill. R. Evid. 403 (eff. Jan. 1, 2011). At trial, in his posttrial motion, and on appeal, defendant has argued that the trial court erred in allowing the prosecution to give the false impression that defendant refused the testing because he knew he was guilty. At trial, defendant argued that he could not effectively cross-examine the State's witnesses without disclosing his criminal history, and on appeal he makes the related argument that the testimony

was unduly prejudicial because he had a right to refuse the testing. We deem this argument sufficiently preserved.[1]

¶ 43                              b. Probative Value and Prejudicial Effect

¶ 44    Federal courts have long held that the admission of evidence that a defendant has exercised his rights is unduly prejudicial and deprives him of a fair trial because it permits the jury to infer consciousness of guilt from the defendant's exercise of his rights. Specifically, several federal circuit courts have held that it is improper for the government to elicit testimony that a defendant refused to consent to a search unsupported by a warrant or probable cause. For example, in *United States v. Moreno*, 233 F.3d 937 (7th Cir. 2000), a United States Customs Service task force encountered Moreno, her husband, and their nine-year-old son during an unrelated investigation. After witnessing a suspicious transaction in which Moreno received a small white bag, the agents followed and eventually stopped the vehicle in which the Morenos were riding. *Moreno*, 233 F.3d at 938. The husband consented to a search of the car, which disclosed $69,000 in cash in the white bag. As it turned out, the agents had stopped the Morenos within a block of their home, so an agent requested and received the husband's consent to search the home. *Moreno*, 233 F.3d at 939. Before the agents entered the home, Moreno yelled something in Spanish to her husband, and he promptly withdrew his consent. The agents, who did not understand what Moreno had said, were forced to obtain a warrant, which resulted in the discovery of cocaine in the house. *Moreno*, 233 F.3d at 939.

¶ 45    Moreno's defense at trial was that she was unaware of her husband's narcotics trafficking and at most was an unwitting accomplice to it. To meet that defense, the government was

_____

    [1] In *Eghan*, a similar claim of error was subject to plain-error review, after this court determined that the defendant had forfeited the issue.

permitted, over Moreno's objection, to elicit testimony from several agents that the husband withdrew his consent after Moreno yelled something in Spanish to him. Although no witness, other than the Morenos, understood what Moreno had yelled, the government was allowed to argue that the jury could reasonably infer that she in some way urged him not to permit the search, which showed that she knew about the narcotics in the house. *Moreno*, 233 F.3d at 939.

¶ 46 The Seventh Circuit Court of Appeals held that the challenged evidence was inadmissible because it had little, if any, probative value and potentially violated Moreno's constitutional rights. First, the court expressed skepticism that the husband's decision to grant or withhold his consent to the search had any probative value regarding Moreno's culpable knowledge of the drugs in the house. The court noted that the government's theory as to the relevance of the husband's statements depended on the assumption that Moreno instructed or encouraged her husband not to let the agents search the house. Although it was possible that she did, it was also possible that she said "something entirely different," such as expressing disgust at his hidden criminality. Even if Moreno in fact said something that encouraged her husband to reconsider his consent to search, the remark did not necessarily reflect guilt on her part. Perhaps she simply reminded him that he had a right to insist on a warrant, as any competent attorney might have done. *Moreno*, 233 F.3d at 940 (" 'Because the right to refuse entry when the officer does not have a warrant is equally available to the innocent and the guilty, just as is the right to remain silent, the refusal is as "ambiguous" as the silence was held to be in *United States v. Hale*, 422 U.S. 171, 176-77 *** (1975).' " (quoting *United States v. Prescott*, 581 F.2d 1343, 1352 (9th Cir. 1978))). The court declined to speculate as to the nature of Moreno's remark, which diminished its probative value. *Moreno*, 233 F.3d at 940.

¶ 47    Second, the *Moreno* court concluded that, even if Moreno's unknown remark had tended to show her consciousness of guilt, "admitting this evidence as a means of establishing Moreno's guilt may have run afoul of her constitutional rights." *Moreno*, 233 F.3d at 940. The court cited the well-settled principle that the government may not point to a defendant's post-arrest silence, or to his invocation of his fifth amendment privilege not to testify, as evidence of his guilt. *Moreno*, 233 F.3d at 940-41 (citing *Doyle v. Ohio*, 426 U.S. 610 (1976), and *Griffin v. California*, 380 U.S. 609 (1965)). The court observed that, in reliance on *Griffin* and *Doyle*, many courts "have either held or suggested that the government may not cite a defendant's refusal to consent to a search of his home as evidence that he knew the search would produce incriminating evidence. [Citations.]" *Moreno*, 233 F.3d at 941. The court held that "[t]he Fourth Amendment entitled the Morenos to withhold their consent to the search, and so to have held up Mr. Moreno's invocation of that right, purportedly at his partner's urging, as evidence that Ms. Moreno knew the house contained contraband, may have been inconsistent with due process." *Moreno*, 233 F.3d at 941.

¶ 48    *Moreno* supports our conclusion that the admission of defendant's refusal to consent to DNA testing was an abuse of discretion because it permitted the jury to infer consciousness of guilt from defendant's exercise of his rights. One could argue that defendant's refusal had some probative value in tending to show his consciousness of guilt, because the discovery of his DNA in the manager's office would confirm his presence there and support the inference that he committed the offense. Refusing to submit to the testing tended to show that defendant expected an incriminating match of his DNA to the crime scene.

¶ 49    That said, defendant could argue that his prior employment at the Burger King provided an exculpatory explanation for finding his DNA in the office. More importantly, the right to

refuse DNA testing in the absence of a warrant or probable cause is "equally available to the innocent and the guilty," rendering defendant's refusal ambiguous. *Prescott*, 581 F.2d at 1352. Perhaps defendant's refusal was motivated simply by his awareness of his fourth amendment right to be free from a compelled DNA extraction.

¶ 50    Any probative value of defendant's refusal to submit to the DNA testing was substantially outweighed by its prejudicial effect. As in *Moreno*, the fourth amendment entitled defendant to withhold his consent to the DNA testing, and holding up defendant's invocation of that right as evidence that he expected his DNA to be found at the crime scene was unduly prejudicial and potentially violated his constitutional rights. See *Moreno*, 233 F.3d at 941.

¶ 51    The State may not introduce evidence that the accused exercised his constitutional right to be free from unreasonable searches and seizures, because the prejudicial effect substantially outweighs the probative value of allowing the jury to infer the accused's consciousness of guilt from his exercise of his rights. In this case, the prejudicial effect was compounded by the admission of evidence that, (1) unlike defendant, the other interviewees consented to the testing; (2) the police obtained and executed a warrant to compel the extraction of defendant's DNA *two days* after he refused to voluntarily submit to testing; and (3) the investigation of the crime scene did not reveal defendant's DNA or any other incriminating forensic evidence. Thus, consistent with *Moreno*, we hold that the admission of evidence of defendant's refusal to submit to testing was an abuse of discretion because it permitted the jury to infer consciousness of guilt from his exercise of his rights.

¶ 52    The parties rely almost exclusively on *Eghan* in support of their opposing positions, but the legal reasoning in that case is inapposite. A jury convicted Eghan of unlawful possession of less than 15 grams of a substance containing cocaine, and on appeal he argued that he was denied

a fair trial because the jury heard testimony of his refusal to submit to a drug test. The evidence showed that two police officers encountered Eghan while patrolling the parking lot of his apartment complex. The officers walked up to Eghan, who was standing next to a pickup truck, and one officer observed a plastic baggie containing cocaine on the rear bumper. *Eghan*, 344 Ill. App. 3d at 304-05. Eghan was arrested and advised of his *Miranda* rights, and he denied ownership of the cocaine. *Eghan*, 344 Ill. App. 3d at 305.

¶ 53    At the police station, one of the officers asked Eghan if he would undergo a drug test to determine the presence of cocaine in his bloodstream. Eghan admitted that he had cannabis in his system but denied ingesting cocaine and refused the test. *Eghan*, 344 Ill. App. 3d at 305. During closing argument, the State noted that the officers had given Eghan an opportunity to take a drug test to show whether he had cocaine in his system. "The State argued, '[Eghan] refused to do that, refused to cooperate. He knew that those drugs on that bumper were his.' " *Eghan*, 344 Ill. App. 3d at 306.

¶ 54    On appeal to this court, Eghan argued that the trial court abused its discretion in allowing evidence that he refused to submit to the drug test proposed by the police. *Eghan*, 344 Ill. App. 3d at 309. He argued that the evidence that he had exercised his fourth amendment right to be free from unreasonable searches and seizures should not have been admitted as evidence of his consciousness of guilt. *Eghan*, 344 Ill. App. 3d at 309 (citing U.S. Const., amend. IV). He also argued that the admission of the testimony violated his fifth amendment right not to be compelled to give evidence against himself. *Eghan*, 344 Ill. App. 3d at 309 (citing U.S. Const., amend. V).

¶ 55    This court held that "the admission of evidence of [Eghan's] refusal did not itself constitute a violation of either the fourth or fifth amendment." *Eghan*, 344 Ill. App. 3d at 310.

The refusal did not violate the fourth amendment, because no drug test was administered and therefore no seizure occurred. *Eghan*, 344 Ill. App. 3d at 310. The refusal also did not violate the fifth amendment, because drug tests are noncommunicative "real or physical" evidence of which the defendant is merely the source and not testimonial statements within the scope of fifth amendment protection. Compelling an accused to submit to a drug test does not violate his constitutional privilege against self-incrimination, and the act of refusing to submit is not itself a compelled communication that violates the fifth amendment *Eghan*, 344 Ill. App. 3d at 310.

¶ 56 Although we concluded that evidence of Eghan's refusal to submit to a drug test did not violate the fourth or fifth amendment, we restated the principle that the admission of such evidence is nonetheless unduly prejudicial and deprives a defendant of a fair trial as it permits a jury to infer consciousness of guilt from the defendant's exercise of his rights. *Eghan*, 344 Ill. App. 3d at 310-11 (citing *Moreno*, 233 F.3d at 940-41, *United States v. Thame*, 846 F.2d 200, 206-07 (3d Cir. 1988) (error for prosecution to comment upon the defendant's refusal to consent to a warrantless search of a piece of luggage), and *Prescott*, 581 F.2d at 1352 (court erred in admitting evidence that the defendant exercised her fourth amendment right to refuse to consent to a warrantless search of her home)).

¶ 57 We held that the admission of Eghan's refusal to submit to a drug test was "unduly prejudicial and denied [Eghan] a fair trial." *Eghan*, 344 Ill. App. 3d at 312. We rejected the notion that the testimony had probative value in tending to indicate a consciousness of guilt. *Eghan*, 344 Ill. App. 3d at 312. We commented that "[t]he only fact that such evidence would have some tendency to support, however, is that [Eghan] had recently ingested drugs," which was not an element of the charged offense of possession of a controlled substance. *Eghan*, 344 Ill. App. 3d at 312. Although evidence tending to establish that Eghan had recently consumed

cocaine might have made it more likely that he had possessed the cocaine found by the police, the probative value of his refusal to submit to a drug test was "limited at best." *Eghan*, 344 Ill. App. 3d at 312.

¶ 58   We also contrasted the limited probative value of Eghan's refusal with its "significant prejudicial effect." *Eghan*, 344 Ill. App. 3d at 312.  The admission of the refusal did not itself violate Eghan's fourth or fifth amendment rights, but it nonetheless allowed the State to argue that his attempt to exercise his rights indicated that he knew he was guilty of the charged offense. We characterized such argument as "improper" and "highly prejudicial and fundamentally unfair." *Eghan*, 344 Ill. App. 3d at 312-13.  The admission of defendant's refusal to submit to DNA testing as showing consciousness of guilt was similarly prejudicial and unfair.

¶ 59   Relying on *Eghan*, the State contends that arguing consciousness of guilt from defendant's exercise of his rights was not error, because, unlike Eghan receiving *Miranda* warnings, defendant had not been advised of the right he was exercising.  Noting that Eghan had been advised, *inter alia*, that he had the right to remain silent, we concluded that "[t]hese warnings effectively informed [Eghan] that he did not have to cooperate with the police or provide them with potentially incriminating information." *Eghan*, 344 Ill. App. 3d at 313.  We determined that "[Eghan's] refusal to consent to a drug test may well have been a consequence of receiving these warnings." *Eghan*, 344 Ill. App. 3d at 313.

¶ 60   The State argues that, while the *Miranda* warnings potentially misinformed Eghan that any refusal of testing could not be used against him, defendant received no such misinformation. This distinction is a red herring, as the administration of *Miranda* warnings is irrelevant in either case.  Instead, the issue turns on whether the accused has a constitutional basis for refusing to consent to the test, not whether he was advised that he did not have to cooperate with the police.

Eghan and defendant each had a constitutional basis to withhold consent, regardless of *Miranda* warnings advising them of that right. Significant prejudice resulted in each case from the prosecution arguing that the exercise of the right to be free from unreasonable searches and seizures showed consciousness of guilt.

¶ 61    We note that, at the times of their respective refusals, Eghan was in custody whereas defendant had appeared at the police station voluntarily and was free to leave. Thus, defendant had even less reason than Eghan to believe that he was compelled to cooperate with the police or provide them with potentially incriminating information. Adopting the State's position in this case would lead to the absurd result of affording greater constitutional protection to a person who receives *Miranda* warnings upon an arrest than to a person whom there is no probable cause to arrest.

¶ 62    The State also cites *People v. Edwards*, 241 Ill. App. 3d 839 (1993), for the proposition that a "refusal to submit to blood and saliva [testing] has some tendency to indicate consciousness of guilt." The State implies that *Edwards* endorses the admission of defendant's exercise of his rights as evidence of his consciousness of guilt, which is misleading. Edwards refused to submit to court-ordered blood testing, while defendant in this case was exercising his right not to consent to be tested.

¶ 63    Edwards was charged with several offenses stemming from the abduction of three women on three separate occasions. *Edwards*, 241 Ill. App. 3d at 840. One of the investigators testified that he was assigned to "execute a court order to have blood and saliva taken from [Edwards]." *Edwards*, 241 Ill. App. 3d at 841. The investigator showed Edwards the order and explained that he must give the samples, but Edwards refused. Rather than compelling extraction, the

investigator left and returned once a month for three months until Edwards relented and submitted to the testing. *Edwards*, 241 Ill. App. 3d at 841-42.

¶ 64    Edwards was ordered to submit to blood testing under Illinois Supreme Court Rule 413(a)(vii) (eff. July 1, 1982), which provides for judicial orders compelling the taking of blood samples.    Rather than mounting a meritless challenge to the constitutionality of the seizure, Edwards argued on appeal that the prejudicial effect of his refusals outweighed the probative value of showing his consciousness of guilt. *Edwards*, 241 Ill. App. 3d at 842.    The Appellate Court, First District, determined that Edwards had forfeited the issue by failing to object at trial but also stated that, if he had made a timely objection, "a ruling against [Edwards] would not have been an abuse of discretion in this case, particularly where the facts indicate that [Edwards] repeatedly sought to hamper the police investigation closing in around him." *Edwards*, 241 Ill. App. 3d at 843.

¶ 65    *Edwards* is easily distinguished from this case.  In finding an abuse of discretion here, we adhere to the principle that, when a defendant exercises his constitutional rights, the admission of the defendant's refusal to waive those rights is prejudicial, and the prejudice substantially outweighs the probative value of allowing the jury to infer consciousness of guilt.   In contrast, when Edwards refused to submit to testing, he was not exercising his rights, but flouting a court order.

¶ 66    We note that our holding is consistent with the rule that, when a motorist refuses to submit to a test designed to determine the person's blood-alcohol content during a DUI stop, evidence of the refusal is admissible and may be used to argue the defendant's consciousness of guilt.  See *People v. Johnson*, 218 Ill. 2d 125, 140 (2005); *People v. Rolfingsmeyer*, 101 Ill. 2d 137, 141 (1984) (because a motorist has no constitutional right to refuse a breath test and may be

compelled by the State to take such a test, evidence of the driver's refusal to take such a test does not violate the self-incrimination privilege and may properly be admitted at trial); *People v. Garriott*, 253 Ill. App. 3d 1048, 1052 (1993) (section 11-501.2(c) of the Illinois Vehicle Code (625 ILCS 5/11-501.2(c) (West 1992)) provides that evidence of a refusal shall be admissible at trial for DUI and, thus, the legislature has determined that evidence of such a refusal is relevant as circumstantial evidence of the driver's consciousness of guilt); see also *People v. Kane*, 223 Ill. App. 3d 377, 385 (1991) (a trier of fact may infer that a motorist refused Breathalyzer testing because he knew the test would confirm he was driving under the influence); *People v. Roberts*, 115 Ill. App. 3d 384, 387 (1983) (evidence of a driver's refusal exposes him to an inference regarding his state of mind about the likely results of that test).  In such an instance, the motorist acquiesces to that possibility by exercising his driving privileges, unlike in this case, where consent was the only possible basis for the search when the police proposed the test.  See *People v. Webber*, 2014 IL App (2d) 130101, ¶ 3 ("Under section 11-501.1, the so-called 'implied consent law,' a motorist operating a vehicle on a public highway in Illinois is deemed to have consented, if arrested for DUI, to chemical testing to determine his or her blood alcohol level.").

¶ 67                                      2. Rent Installments

¶ 68    Defendant next argues that he was unduly prejudiced by the trial court's exclusion of evidence that most of the other residents of his apartment complex paid rent as he did.  We review the trial court's exclusion of the evidence for an abuse of discretion, and we will not reverse the ruling unless it is arbitrary, fanciful, or unreasonable.  See *Hanson*, 238 Ill. 2d at 101.

¶ 69    The property manager testified that defendant often paid in three to four installments per month.  The manager stated that he was "working with" defendant and never charged him a late fee, to ensure he could continue residing in the complex.  The State argued that defendant's

method of payment showed he had money problems, which created a motive for the offense. A related inference is that defendant would not need to resort to installment rent payments if he was flush with cash, as the search of his home revealed.

¶ 70    The trial court barred the defense from showing that almost all the other tenants in the complex paid rent under similar payment arrangements. Defendant argues that such evidence would have shown that he had merely availed himself of a payment arrangement afforded to all residents, which would tend to negate the State's claim that defendant had money problems and was financially motivated to commit the offense. Defendant also contends that any financial problems he might have had were not proper evidence of motive, because nearly everyone shares a desire to obtain more money, which hardly made him uniquely motivated.

¶ 71    In September 2010, our supreme court adopted Federal Rule of Evidence 406, which allows for the admission of habit evidence regardless of eyewitness testimony. *Powell v. Dean Foods Co.*, 2013 IL App (1st) 082513-B, ¶ 124. Illinois Rule of Evidence 406 provides that "[e]vidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." Ill. R. Evid. 406 (eff. Jan. 1, 2011). Defendant argues that evidence of the payment practices of the other residents was admissible under this rule to show that he paid rent in conformity with the routine practice of the apartment complex.

¶ 72    Under the circumstances, the trial court did not abuse its discretion in excluding the evidence of other residents' payment practices. Defendant does not argue that the practice was in accordance with any lease or written policy of the complex. More importantly, the evidence of how other residents paid would have been irrelevant on the issue of whether defendant had

financial problems and thus a financial motive to commit the offense. As the State argued, defendant would not have needed to resort to installment rent payments if he had not obtained all the cash in his home recently. The court's exclusion of evidence of the residents' payment practices was not an abuse of discretion and did not prejudice defendant.

¶ 73                                3. Closing Argument

¶ 74    Finally, defendant argues that he is entitled to a new trial, based on improper comments made by the prosecution during closing argument. Defendant objected at trial to the prosecution's argument that the jury should not "reward" defendant for "doing [his] job too well" because he was either "smart enough or lucky enough not to leave his fingerprints at [the] crime scene." Defendant argues that the argument was (1) "entirely improper, as it shifted the burden of proof away from the prosecution and suggested, repeatedly, that the prosecution's lack of proof was somehow a 'reward' for [defendant]" and (2) turned the presumption of innocence on its head by characterizing it as a "reward."

¶ 75    It is well settled that prosecutors are afforded wide latitude in closing argument, and even improper remarks do not merit reversal unless they resulted in substantial prejudice to the defendant. *People v. Burman*, 2013 IL App (2d) 110807, ¶ 25. During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel that invite response, and comment on the credibility of witnesses. *Burman*, 2013 IL App (2d) 110807, ¶ 25. In reviewing whether comments made during closing argument are proper, we must view the closing argument in its entirety and view remarks in context. *Burman*, 2013 IL App (2d) 110807, ¶ 25.

¶ 76    We recognize that our appellate courts are divided on the standard of review for closing remarks. *Burman*, 2013 IL App (2d) 110807, ¶ 26. The confusion stems from two supreme

court cases. In *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), the supreme court held that whether a prosecutor's remarks are so egregious as to require a new trial presents a question of law, which is reviewed *de novo*. However, the *Wheeler* court also cited with approval *People v. Blue*, 189 Ill. 2d 99 (2000), wherein the court applied the abuse-of-discretion standard to review a prosecutor's remarks. *Wheeler*, 226 Ill. 2d at 121. Where the result would be the same regardless of the standard applied, the appellate court has noted the conflict but has declined to determine the appropriate standard. *Burman*, 2013 IL App (2d) 110807, ¶ 26. Because we would reach the same result under either standard in this case, we refrain from discussing the applicable standard until our supreme court resolves the conflict. *Burman*, 2013 IL App (2d) 110807, ¶ 26.

¶ 77    In relation to the reward comments, the prosecution stated, "if a defendant is either smart enough or lucky enough not to leave his fingerprints at a crime scene, then according to [the defense] the defendant gets found not guilty." A charitable translation is that physical evidence, such as fingerprints and DNA, is not necessary to prove a defendant's guilt, and the absence of such evidence does not compel an acquittal. In fact, the prosecution expressly argued in rebuttal that "you are not going to get an instruction from Judge Shanes that says the State has to present DNA evidence or you must have DNA evidence or you must have biological evidence to find someone guilty."

¶ 78    In making the reward comments, the prosecution was not technically shifting to defendant the burden to prove his innocence or urging disregard of the presumption of innocence. Moreover, the State subsequently explained to the jury that the prosecution had the burden of proving each element of the offense beyond a reasonable doubt. Viewing the closing argument in its entirety and taking the remarks in context, we conclude that the comments do not

rise to the level of prosecutorial misconduct. See *Burman*, 2013 IL App (2d) 110807, ¶ 25. However, the argument could have been made much more artfully, and we caution prosecutors to refrain from such unnecessary rhetoric that risks a diminution or confusion of the presumption of innocence or the burden of proof.

¶ 79                                     4. Harmless Error

¶ 80     The trial court abused its discretion in admitting the evidence of defendant's refusal of DNA testing and allowing the State to argue that his exercise of his constitutional rights showed consciousness of guilt. Defendant argues that this error entitles him to a new trial. The State responds that any error was harmless beyond a reasonable doubt because the prosecution offered significant evidence of defendant's guilt. Although we do not condone the error, we reluctantly agree with the State.

¶ 81     To establish that an error was harmless, the "State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error." *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). When deciding whether an error was harmless, a reviewing court may: (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008).

¶ 82     The State introduced overwhelming circumstantial evidence of defendant's guilt. The victim's body was found at 5:10 a.m. At 4:23 a.m., two phone calls were placed from defendant's cell phone to the Burger King, his former place of employment. Defendant had called the Burger King during the weeks preceding the incident, but the two calls placed that morning were the only ones using "*67" to block the receiver's caller identification feature.

¶ 83   At 4:42 a.m., about 20 minutes after the safe was opened, defendant was seen at the White Hen a few miles from the Burger King. The eyewitness testimony of defendant's presence at the White Hen contradicted defendant's statement to police that he went to the Lake Villa post office at 4:17 a.m. between his shifts at McDonald's and Value City.

¶ 84   Defendant made several incriminating statements to police. Defendant talked about having a "f*** up feeling," having evil inside him, struggling between good and evil, the officers knowing what he did, and apologizing to the victim's husband for what he did.

¶ 85   The police found cash, arranged denominationally, like that from the Burger King safe, in a plastic bag hidden in the lining of a coat in defendant's bedroom closet. Defendant's fingerprints were on the bag. The police also found a pillow case with quarters and dimes in the exact amounts missing from the safe. The State contrasted the discovery of cash in defendant's home with evidence that he had financial problems, which caused him to borrow money from a friend and pay rent in small amounts.

¶ 86   The evidence, though entirely circumstantial, overwhelmingly proved defendant's guilt, such that the prejudicial testimony that defendant exercised his rights in refusing the DNA testing did not contribute to the conviction. This is especially true since defendant's DNA was not discovered at the crime scene.

¶ 87                              B. Inconsistent Verdicts

¶ 88   Defendant argues that a new trial is necessary because the jury returned inconsistent verdicts in finding him guilty of intentional murder (720 ILCS 5/9-1(a)(1) (West 2006)) and not guilty of knowing murder (720 ILCS 5/9-1(a)(2) (West 2006)). "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death: (1) he either *intends* to kill or do great bodily harm to that individual or

another, or knows that such acts will cause death to that individual or another; or (2) he *knows* that such acts create a strong probability of death or great bodily harm to that individual or another[.]" (Emphases added.) 720 ILCS 5/9-1(a)(1), (a)(2) (West 2006). "When the law provides that acting knowingly suffices to establish an element of an offense, that element also is established if a person acts intentionally." Pub. Act 96-710, § 25 (eff. Jan. 1, 2010) (adding 720 ILCS 5/4-5). Defendant concludes that it is impossible to commit intentional murder without also committing knowing murder and that the inconsistent verdicts require a new trial. The State concedes that "the less culpable state of knowledge is subsumed within defendant's intentional acts."

¶ 89 Although the inconsistency of the guilty and not guilty verdicts is uncontested, our supreme court has held that defendants may "no longer challenge convictions on the sole basis that they are legally inconsistent with acquittals on other charges." *People v. Jones*, 207 Ill. 2d 122, 133-34 (2003). The *Jones* court found persuasive *United States v. Powell*, 469 U.S. 57 (1984), which articulated that constitutional law does not require consistency in the verdicts and that inconsistent verdicts can often be explained as a product of juror lenity. *Jones*, 207 Ill. 2d at 130. The *Powell* Court explained as follows:

" ' " 'The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.' " ' " *Jones*, 207 Ill. 2d at 130 (quoting *Powell*, 469 U.S. at 63, quoting *Dunn v. United States*, 284 U.S. 390, 393 (1932), quoting *Steckler v. United States*, 7 F.2d 59, 60 (2d Cir. 1925)).

¶ 90    The *Powell* Court also set forth three additional reasons for refusing to allow defendants to challenge convictions on the basis of inconsistency: (1) when a jury enters inconsistent verdicts, no one knows whom the error benefits, because all that can be gleaned is that the jury did not follow the instructions (*Powell*, 469 U.S. at 65); (2) fashioning a rule that would allow only the defendant to challenge an inconsistent verdict, where the inconsistency could harm either side, would be unfair because the government is precluded from challenging an acquittal on inconsistency grounds (*Powell*, 469 U.S. at 65); and (3) the defendant is still protected from jury irrationality, because the defendant can always challenge his or her conviction on sufficiency-of-the-evidence grounds (*Powell*, 469 U.S. at 67).  *Jones*, 207 Ill. 2d at 130-31.

¶ 91    The guilty verdict on the intentional murder count and the not guilty verdict on the knowing murder count present a situation governed by *Jones* and *Powell*.  The jury's conviction on one count is inconsistent with its acquittal on another count, because the jury found that the same essential element both did and did not exist.  See *Jones*, 207 Ill. 2d at 135-36.  *Jones* and *Powell* hold that such an inconsistency is not a basis for reversing the conviction and ordering a new trial.

¶ 92    Citing the well-settled rule that "defendants in Illinois can no longer challenge convictions on the sole basis that they are legally inconsistent with acquittals *on other charges*" (emphasis added) (*Jones*, 207 Ill. 2d 133-34), defendant argues that *Jones* is inapplicable because "there was a guilty verdict and acquittal *on the same charge*" (emphasis in original).  Defendant claims that intentional murder and knowing murder are the "same charge" for purposes of reviewing inconsistent verdicts.  We disagree.  While intentional murder and knowing murder are both "murder," the statutes defining the offenses represent different ways to charge murder.  Defendant was tried on two separate charges of murder, based on the distinction.

¶ 93                                    III. CONCLUSION

¶ 94    For the reasons stated, we affirm the judgment of the circuit court of Lake County.  The State may not introduce evidence that the accused exercised his constitutional right to be free from unreasonable searches and seizures, because the prejudicial effect substantially outweighs the probative value of allowing the jury to infer the accused's consciousness of guilt from his exercise of his rights.  However, in this case, the error was harmless beyond a reasonable doubt.  As part of our judgment, we grant the State's request that defendant be assessed the State's Attorney fee of $50 under section 4-2002(a) of the Counties Code (55 ILCS 5/4-2002(a) (West 2014)) for the cost of this appeal.  See *People v. Nicholls*, 71 Ill. 2d 166, 179 (1978).

¶ 95    Affirmed.