2021 IL App (1st) 191376-U

No. 1-19-1376

Order filed June 11, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 7777 |
| | ) | |
| WALTER HILL, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ODEN JOHNSON delivered the judgment of the court.

Presiding Justice Mary Mikva concurred, with Rule 23.
Justice Sheldon Harris dissented, with Rule 23.

**ORDER**

¶ 1    *Held*:  We reverse, finding that the trial court erred in denying a motion *in limine* that sought the exclusion of evidence of a previous traffic stop because its prejudicial effect substantially outweighed its probative value.

¶ 2    Defendant Walter Hill was convicted of first degree murder and aggravated kidnapping of

Tracy Hughes (decedent) on January 11, 2009, following a simultaneous but separate jury trial

with codefendant David Johnson.[1] The trial court sentenced defendant to consecutive prison terms of 25 years for first degree murder and 10 years for aggravated kidnapping, for a total of 35 years' imprisonment.

¶ 3    On appeal, defendant contends that: (1) the evidence presented at trial was insufficient to find him guilty beyond a reasonable doubt; (2) the trial court erred in admitting evidence of an unrelated traffic stop, and; (3) trial counsel rendered ineffective assistance. For the following reasons, we reverse and remand.

¶ 4                              BACKGROUND

¶ 5                         A. Pretrial Proceedings

¶ 6    The parties filed numerous motions *in limine* prior to trial. The two motions *in limine* relevant to this appeal are detailed herein. The State filed a motion *in limine* on November 20, 2017, seeking to introduce statements made by decedent during three 911 calls on the night he was killed as dying declarations. The motion detailed the statements made by decedent during each call.

¶ 7    The first call occurred on January 11, 2009 at approximately 1:05 a.m. during which decedent made the following statements: "they kidnapped me, I'm in the trunk of a car, they are trying to kill me. I know them, trace this call, please help me." Decedent provided the dispatcher with his name and informed the dispatcher he was in the truck of a blue four-door Oldsmobile Cutlass. Decedent told the dispatcher that there were two people in that car and four people in a brown Buick Park Avenue that was following. Multiple voices were heard in the background and then decedent stated, "they shot me, they shot me, they shot me." The call was disconnected, the dispatcher tried calling back immediately but received no response.

---

[1] Codefendant Johnson had a bench trial and was acquitted.

¶ 8       The next call made by decedent was at approximately 1:09 a.m., when he stated, "they shot me, I'm shot in the trunk of the car, trace this call." In response to the dispatcher asking who shot him, decedent said, "David and Walter Hill from Dolton. I'm dead. I'm dead. It's a four door Cutlass. Trace this call please. They shot me three times, help me. Please hurry up." The dispatcher tried to ascertain decedent's whereabouts but was unsuccessful.

¶ 9       The last call was made at approximately 1:16 a.m. Decedent stated, "please trace this call, they, got me in the back of a trunk, they shot me three times. Trace these calls so you see where I'm at. I'm Tracy Hughes. I'm dead." In response to the dispatcher asking once again who shot him, he stated, "Walter Hill from Dolton, Illinois and David, his cousin. They got me, I'm dead. Please help me, my phone is about to go dead."

¶ 10      The motion further stated that on January 12, 2009, Dr. Michael Humilier performed an autopsy on decedent and determined that the cause and manner of death was multiple gunshot wounds/homicide. The State sought to introduce decedent's statement under the dying declaration exception to the hearsay rule pursuant to *People v. Graham*, 392 Ill. App. 3d 1001 (2009).

¶ 11      At the hearing on the State's motion *in limine*, defendant argued against admission of decedent's statements as dying declarations because decedent demonstrated that he did not think he was going to die and would be found as evidenced by his continued attempts to get the dispatcher to trace his phone call. The State argued that decedent knew he was going to die because he repeatedly stated he was shot and was going to die. The trial court determined that all of decedent's statements were admissible as spontaneous declarations, excited utterances, and dying declarations, all of which showed indicia of reliability.

¶ 12      Defendant filed a motion *in limine* on July 25, 2018, seeking to exclude the admission of evidence surrounding a 2008 traffic stop that occurred in Arkansas. When the stop occurred,

decedent was driving defendant's car and defendant was a passenger. The stop resulted in decedent's arrest on a felony warrant for theft while defendant left with his vehicle. The officer asked to search the vehicle, but defendant did not consent to a search. Defendant argued that the stop had no relevance to decedent's death, which occurred two months after the stop, and that the probative value of the evidence was outweighed by the unfair prejudice to defendant. Defendant also argued that the evidence would mislead the jury to believe that defendant was involved in drug trafficking when no evidence of drug trafficking was presented based on the State's proposed theory of the case at the time. The State was working on a theory of the case that would establish that defendant and decedent were involved in an illegal business. Defendant further argued that the evidence was cumulative in nature since he assumed the State would argue that the evidence showed that the defendant and decedent knew each other. The State presented no argument on the matter, other than to assure the trial court that it would not attempt to say the vehicle was a rental car.

¶ 13    After a hearing on defendant's motion, the trial court found that the State could admit the evidence to establish that there was a "nexus" between decedent and defendant and to establish their relationship.

¶ 14                                    B. Trial Proceedings

¶ 15    Erin Hansen, a 911 dispatcher for the Chicago Office of Emergency Management Communications (EMS), testified that EMS kept recordings and notes in the ordinary course of its business of receiving 911 calls and dispatching police in response to those calls. In particular, audio recordings were made of, and notes were taken regarding, several 911 calls received on January 11, 2009, from 1:02 a.m. onward. A transcript of the recordings was also produced by

EMS, and Hansen testified that, after listening to the recordings and reading the transcript, the latter was an accurate reflection of the former.

¶ 16    The audio recordings of four 911 calls were then played for the jury. In three of the four calls, the caller identified himself as Tracy Hughes. The caller reported having been kidnapped and, in all four calls, he said he was in the trunk of a blue Cutlass sedan and asked the operator to trace his call. He stated in two calls that the Cutlass contained two people and was accompanied by another car with four people, specifying in one call that the other car was a brown Park Avenue. In the first two calls, the caller said repeatedly that the kidnappers were "trying to kill me," adding in the second call that they had a gun, and in the last two calls said repeatedly "I'm dead." The second call ended just after there were other voices in the background, a gunshot was heard, and the caller reported that he had been shot. In the third call, he said that he had been shot twice, then said he was shot again, and in the third and fourth calls said he had been shot three times. In the third call decedent repeatedly stated he was shot. In response to the dispatcher asking if he knew who shot him, decedent repeatedly stated, "David and Walter Hill," and stated that they all lived in Dolton, Illinois.  Decedent continued to state, "please come hurry up. They shot me in the trunk. I'm dead." In the fourth call, in response to the dispatcher's asking who the perpetrators were, decedent stated, "Walter Hill of Dolton, Illinois and David his cousin. They got me, I'm dead." Decedent warned his phone was going to die.

¶ 17    Notes from EMS indicated that the first call lasted from 1:02 a.m. to 1:04 a.m., the second from 1:05 a.m. to 1:09 a.m., the third from 1:09 a.m. to 1:15 a.m., and the fourth from 1:16 a.m. to 1:17 a.m. The notes also reflected that police were *en route* to a certain address in Dolton at 1:28 a.m. and arrived there at 1:46 a.m.

¶ 18    On cross-examination, Hansen testified that EMS records the name provided by a caller without necessarily knowing that the caller was the named person. EMS can trace a 911 call "[d]epending on the type of phone," which "could give a location range for the caller."

¶ 19    Chicago Police Officer Michael Prohaska testified that he was assigned to patrol and handling calls received from the 22nd District on January 10 and 11, 2009, when EMS reported at about 1:06 a.m. that there was a kidnapping in progress with the victim in the trunk of a car on the telephone with EMS. In response, Prohaska unsuccessfully searched for the blue Cutlass in a specified location. He then went to another location based on a "ping" from the victim's cellphone, and then to another location, but was also unsuccessful finding the Cutlass in those areas. At some point, EMS reported that the kidnapping victim had been shot, was still in the trunk, did not know where he was, and reported that one of the people who put him in the trunk and shot him was defendant. Prohaska's report reflected that the victim also named a David Hill as a participant.

¶ 20    Based on a police records search for the name Walter Hill, Prohaska went to 14346 South Maryland in Dolton, which took him 15 minutes from his prior location without activating the emergency lights or siren. He and other officers arrived there at approximately 2 a.m., where he and other officers knocked on the door and a man answered, who Prohaska initially identified at trial as codefendant Johnson. When Prohaska asked the man for identification, he provided a driver's license. The man indicated to Prohaska that decedent was his cousin, he did not know where decedent was, and he did not know anyone with a blue Cutlass. Prohaska asked the man about a white BMW registered to that address, and he said that it was his wife's car, but she was not home as she was likely at a club with decedent. The man said that he had been at home for the last few hours. He was calm and cooperative, answering questions but not asking any. Warren

Elder was also present and Prohaska spoke with him for a while, but he provided no additional information.

¶ 21    On cross examination, Prohaska testified that EMS would have recorded that he was going to Dolton when he reported by radio that he was going to do so. Prohaska admitted that he was mistaken in his earlier identification, at trial, clarifying that the man at the door was defendant as he resembled the license he provided. Prohaska spoke with defendant for about 20 to 30 minutes, and he interviewed Teresa McBeth, defendant's sister-in-law, as well as Warren Elder, Teresa's husband. He never searched the interior of the home for anyone else as he never entered the home but remained on the front porch.

¶ 22    On redirect examination, Prohaska testified that he interviewed other people during his investigation and wrote down their names and any telephone numbers they provided. One of those numbers was decedent's number as provided by defendant, which Prohaska later included in his report.[2] Prohaska called the number that defendant provided for decedent, but nobody answered.

¶ 23    Chicago Police Detective Kevin Eberle testified that he and Detective Brian Forberg were working on the early morning of January 11, 2009, when they were assigned at about 2:45 a.m. to investigate the kidnapping and shooting of decedent based on information received from his 911 calls that he was in the trunk of a blue Cutlass. Eberle and Forberg went to a particular location where the caller said he had been kidnapped and joined officers searching for such a car and victim, but their search was unsuccessful. After speaking with Officer Prohaska, Eberle and Forberg went to defendant's Dolton home and saw defendant upon arriving there at about 4 a.m. When asked, defendant said decedent was his cousin and he last saw him on the evening of January 10, 2009, when he went to a club with defendant's wife Valerie Hill and another person.

---

[2] The number was not the one referenced in Hansen's testimony or the evidence from EMS.

¶ 24 Detectives Eberle and Forberg then went elsewhere to look for decedent based on information from police records. They went to decedent's last known address, which was 4513 North Magnolia in Chicago. When they arrived there, they spoke with decedent's wife Nicole who told them that she last saw decedent on Friday night into Saturday morning of January 9 and 10, 2009, after they had a brief altercation. Eberle and Forberg then listened to the 911 recordings of decedent's calls at EMS and were provided copies. They subsequently learned that the blue Cutlass had been found by other officers. They returned to decedent's house and informed his wife of decedent's apparent death, then went to the police station to compile their notes.

¶ 25 On the afternoon of January 12, 2009, Eberle and Forberg returned to defendant's Dolton home to interview him. Defendant reiterated that decedent was his cousin and added that he was like a brother to him. He had traveled with decedent about a week earlier to Tennessee to bring decedent's son home, and decedent mentioned that he was going to spend time with Nicole when he returned home. Defendant called decedent on the morning of January 10, 2009, and invited him to breakfast, but decedent declined because he was going to meet someone; defendant did not know her name. Defendant saw him at about 6 p.m. that evening when he came to defendant's home in a rental car. Defendant did not mention that he had rented that car, nor did he describe it, nor did he mention that decedent had an altercation with Nicole. Defendant said that, while at his home, decedent made a phone call and then left about 45 minutes later. Defendant left home about 11 p.m. that night to get his children from a relative's home and went to bed when he returned. His demeanor during both interviews was calm and without apparent concern; he asked no questions about decedent.

¶ 26    On cross examination, Eberle testified that he generally took notes during interviews, and sometimes compared his notes with his partner's notes, and then wrote his reports. Eberle testified that when he went to defendant's home the second time, he knew decedent was dead.

¶ 27    Chicago Police Sergeant Charmane Kielbasa testified that she was on patrol on January 11, 2009, when she learned that at about 1 a.m. a person was reported as kidnapped and being held in the trunk of a blue Cutlass in a certain area. Kielbasa went to that area to search for the Cutlass but was unsuccessful. At about 9 a.m. she went to another location a few blocks away because a blue Cutlass had been found parked and blocking an alley. There, she saw blood dripping from the car onto the snowy ground near the trunk. Nobody was sitting in the car, and the trunk was closed "but the lock was punched." She and another officer opened the trunk and found decedent's body. While she did not know for certain at that time who decedent was, the circumstances fit the 1 a.m. dispatch. Kielbasa testified that various photographs of the scene accurately depicted the scene that night, including the blood on the snow and decedent's body in the trunk.

¶ 28    Chicago Police Detective Timothy Murphy testified that, in investigating the decedent's death, he listened to the 911 recordings implicating Walter Hill and his cousin David. He had learned that defendant had a cousin named David, specifically David Johnson. Murphy learned that the blue Cutlass in which decedent's body was found was owned by Francisco Avendano-Ruiz and had been reported stolen. Murphy spoke with Avendano-Ruiz, who was cooperative and provided a DNA sample, and Murphy concluded that he did not know defendant. Murphy learned that a casino "player's card" from an Indiana casino was recovered from decedent's body. When he went to the casino and was provided security video including decedent, Murphy noticed that decedent had "a large amount of money." Decedent left with another man in a white Hyundai Azera and drove to Chicago using the Skyway. Murphy subsequently learned that the man who

drove the Hyundai was decedent's neighbor Troy Jagodowski. Upon speaking with Jagodowski, Murphy discovered that the Hyundai's tolls were paid by a toll transponder, which he later learned from the Illinois Tollway Authority (Tollway) was registered to defendant. The registered owner of the Hyundai was Advantage car rental agency[3] (Advantage), which confirmed that defendant rented the Hyundai, and employees Antoine Silas and Eric Rodriguez handled the rental contract. After speaking to Silas and Rodriguez, Murphy learned that Silas knew defendant. Advantage's records showed that defendant's rental of the Hyundai ended on January 9, 2009. However, casino and Skyway video showed the Hyundai was still in decedent's possession on January 10, 2009. Rodriguez confirmed that the Hyundai was returned on January 12, 2009.

¶ 29 Pursuant to a warrant, defendant's Dolton home was searched in February 2009 and cellphones belonging to defendant, his wife Valerie and his sister Martha were recovered. Murphy testified that the only call made from any of defendant's cellphones[4] to the decedent's cellphone, after the police told defendant that decedent was missing or kidnapped, was on January 11, 2009 at 9:40 a.m.: the call was answered but he did not know by whom.

¶ 30 The records from those cellphones led Murphy to Randall Weathersby, as his cellphone called defendant's cellphone shortly before 8 a.m. on January 11, 2009. The records also showed that defendant's cellphone called both Advantage and Silas's cellphone shortly thereafter. After Murphy and Detective Daniel Stover interviewed Weathersby, he was arrested, and a DNA sample was taken. In the interview, Weathersby initially denied retrieving the Hyundai from a tollway oasis but then admitted doing so. Weathersby did not say at any time during the interview that decedent asked him to pick up the Hyundai or that defendant provided him the keys to do so.

---

[3] We take judicial notice that the official name of the company is Advantage Rent a Car.
[4] Defendant had multiple cellphone accounts in his name, but the specific phone used to make this call was not evident from the record.

¶ 31    The parties stipulated that if called to testify, Avendano-Ruiz would testify to owning a blue Oldsmobile sedan in January 2009 which was stolen between 11 p.m. and midnight on January 10, 2009, going into January 11, 2009, and did not have any damage to the steering wheel column when he last saw it.

¶ 32    Chicago Police Detective Daniel Stover testified that, while investigating this case, he listened to the 911 recordings. Hearing the name Walter Hill, he asked Detectives Eberle and Forberg about the names and learned that they had interviewed defendant at his home. Stover went to defendant's home several times during his investigation. He would sometimes drive from the scene where decedent's body was found to defendant's home. That trip, taken without emergency lights or siren, took up to 17 minutes with heavy expressway traffic but as little as eight minutes in the early morning. Stover thought this was significant because he believed decedent was killed at about 1:05 a.m. Stover also surveilled defendant's home, because decedent had said in the 911 recording that Walter Hill and David were not alone in the kidnapping but a second car was involved. Stover checked the license plates of visitors to defendant's home as possible investigation leads to attempt to figure out who was in the second car. He was also looking for the rental car used by decedent.

¶ 33    Stover obtained and executed a search warrant for defendant's home in late February 2009, where he found three duffel bags, 10 cellphones, including ones registered to defendant, Martha, Valerie, and Warren, two registered to Warren's wife, and four that Stover concluded were irrelevant to the investigation. Stover also recovered the credit card used to pay for the rental car, which was in defendant's name, and various telephone bills bearing the name of defendant or his business, including at least one encompassing the day of decedent's death, and another telephone bill under Valerie's name. Stover also recovered a hotel bill from a November 2008 stay in

Memphis that he considered relevant due to the November 2008 Arkansas traffic stop of defendant and decedent.

¶ 34    Tollway employee Kevin Foster testified that the Tollway, in the ordinary course of its business, kept records of tolls billed to transponders registered to tollway users, and that a transponder user could place it in a rental car as well as cars he or she owns. A transponder was registered to defendant for use in multiple vehicles, none of which was a Hyundai. The transponder records showed five tolls paid on January 10, 2009, including one on the Skyway in Indiana at 7:13 a.m. and another on the Skyway at 12:53 p.m.

¶ 35    By way of stipulation and testimony, evidence was presented showing that cellphone companies kept records based on subscriber information in the ordinary course of business. Documents presented were described as records for four cellphones registered to defendant, and one each for decedent, codefendant, Martha, Valerie, Silas, and Weathersby. The companies could not tell who was using these cellphones at any time. The records were entered into evidence.

¶ 36    Nicole Hughes testified that she was married to decedent for 10 years. She spoke with decedent on the telephone nearly daily for years, "hundreds or thousands" of times, and would recognize his voice on the telephone "[w]ithout a doubt." Before trial, Nicole listened to the 911 recordings of the calls on the early morning of January 11, 2009 and identified the caller as decedent.

¶ 37    Nicole knew defendant, who was very close to decedent. Having been to defendant's Dolton home many times, she knew his family. She knew codefendant, who was close to defendant and decedent, and also knew Randall Weathersby. Decedent often drove Malcolm Manuel, defendant's cousin, in rented cars, but she could not recall where they were rented. Manuel was "familiar" to her because decedent would act as his chauffeur, but Nicole did not feel she knew

him. Nicole knew Silas because he and decedent knew each other from Mississippi, where decedent was from.

¶ 38    Decedent was unemployed from mid-2008 onward. He went frequently to casinos, often accompanied by neighbor Troy Jagodowski. Decedent drove a light-colored car that defendant rented for him during that time.  On November 10, 2008, decedent called Nicole to say that he had been arrested in Arkansas where he was with defendant and asked her to make several calls for him as he was going to jail. She did not know why decedent was arrested in Arkansas, nor why he was arrested sometime later in Georgia. She posted bond for decedent after defendant gave her $4000 cash.

¶ 39    On January 9, 2009, Nicole was home with decedent until they argued in the early morning of the following day. He had her children hold her back as he flipped over a love seat in the bedroom, retrieved a wrapped stack of cash hidden inside, and left home with the cash and a duffel bag of clothes. She had never seen decedent with that much cash before, and she thought he may have stolen it. She had no subsequent contact with decedent. Detectives came to her door at about 7 a.m. on January 11, 2009, looking for him, but she was unable to tell them his whereabouts. When the detectives left, Nicole called her mother and then defendant, believing that "if anybody knew where Tracey [*sic*] Hughes was, it would be him." Defendant at first denied knowing where decedent was, then said that he left defendant's home the night before with a woman. Nicole was skeptical of this explanation, as defendant had counseled decedent and Nicole about their marriage and had not "threw his boy under the bus for infidelity in the ten years [*sic*]." When detectives later returned to Nicole's home, they told her that decedent was dead and asked what to do about his belongings but did not explain the circumstances of his death. They asked her not to tell anyone else for one hour that he was dead, and she complied.

¶ 40    When Nicole arrived at the Cook County Medical Examiner's (Medical Examiner) Office on January 12, 2009, defendant and Elder were there She viewed decedent's body and went through a bag containing his belongings. Defendant and Elder entered the room where decedent's belongings were located before Nicole could, but neither removed anything from the bag. In February 2009, defendant told Nicole that he had decedent's clothes, but she did not go to get them. In March 2009, detectives showed Nicole a cellphone and three duffel bags containing shoes and clothing, and she identified the bags and its contents as belonging to decedent.

¶ 41    On cross examination, Nicole testified that, as detectives questioned her at various times about her relationship with decedent, she added more details but denied that she was "trying to hold back." Her relationship with decedent "didn't always have a smooth path" due to problems including his "very heavy" gambling and her concern that he was unfaithful. Nicole reiterated that defendant counseled or advised her and decedent about their marriage, adding that he gave balanced advice rather than always favoring decedent as his close friend. Nicole could not "recall who asked who" to be at the Medical Examiner's, but defendant was there at the same time she was. When defendant offered decedent's duffel bags to Nicole, she was unsure whether he had called her as she had asked for them multiple times. Defendant had never denied having decedent's duffle bags.

¶ 42    Valerie Hill, defendant's wife, testified that her maiden name was McBeth. Codefendant is a maternal cousin to her, and he and defendant were close; Valerie did not see them together "a lot" due to their separate jobs but they talked on the phone often. Valerie also knew decedent for years as a family friend, "kind of like a cousin," and his wife Nicole. Defendant sometimes helped decedent financially, and vice versa, because they were related. Valerie knew Warren as he was married to her sister Teresa. She did not know Manuel.

¶ 43    In January 2009, she and defendant lived in Dolton and she owned a white BMW that she shared with him as he drove a truck for work. Martha Hill, defendant's sister, lived with them at the time. Valerie did not know where codefendant lived. Defendant would rent cars to visit relatives in Wisconsin and Mississippi, but Valerie could not recall where he rented them. On the weekend beginning on Friday, January 9, 2009, the Elders visited her and defendant. On the night of Saturday, January 10, 2009, Valerie was not home from about 5 p.m. until after midnight, she was working as a party planner. She was not at a club with decedent or anyone else that night and did not see decedent any time that day or the next. When Valerie got home on the early morning of January 10, 2009, defendant was in bed and the Elders were up. They mentioned that the police had come to the home earlier that morning looking for decedent. Valerie could not recall exactly when the police told her that decedent was dead. Police later searched her home pursuant to a search warrant, but she did not know what they took. Some of decedent's clothes were at her home because he often spent the night, and he generally kept some clothing in the front closet.

¶ 44    Martha Hill, defendant's sister, testified that codefendant was a family friend and defendant's wife Valerie and codefendant were cousins. In January 2009, Martha was living with defendant and Valerie. Weathersby would stop by often, and Manuel was another cousin and family friend. Martha testified consistently with Valerie that the Elders were visiting the weekend of January 10, 2009. Martha saw decedent at some point during the weekend, including going grocery shopping and eating dinner with him in defendant's home, but she could not recall when. Various other people were also at dinner including codefendant. At some point, defendant complained that a significant amount of money was missing from the home. Martha knew there was a large amount of money in the home because she counted it once at defendant's request. She could not recall at trial exactly how much cash she counted, but it "was several thousand" dollars.

At the time, defendant was employed and also owned a trucking company. Martha did not know or could not say what other work he may have done. She did not know where he obtained the large amount of cash nor where he kept it. When defendant complained of the missing money, Martha left the room to leave the matter to the men present, including both defendants. Decedent left the home after dinner, and Martha believed he left before the discussion of missing money. Sometime in the evening before Martha went to bed, she noticed that the front door would not close completely. Because Martha was doing many of the household chores, she did not notice who was home or where, and thus could not answer whether decedent was at the home on the night of January 10, 2009, watching football.

¶ 45    On the early morning of January 11, 2009, Martha woke in the night, but someone told her to go back to bed, so she did not see the police at the home. Later that morning, she received multiple calls asking if she knew where decedent was or what happened to him. At some point after she learned that decedent was dead, Weathersby told Martha that defendant had asked him to retrieve a car from a tollway oasis. Martha accompanied Weathersby to the oasis and went home alone in the car they arrived in. She could not recall what kind of car Weathersby left the oasis in.

¶ 46    On cross examination, Martha clarified that she was not interviewed by police at any time that weekend in January 2009. She denied calling the police at the end of 2010. She was interviewed by police and an assistant State's Attorney (ASA) in January 2013 when she was no longer living in Illinois. She was also interviewed by an ASA just before trial.

¶ 47    On redirect examination, Martha testified that her flight to Chicago for trial, a night in a hotel, and her return flight home were paid for by the State. She was not told what to testify to in her pretrial interview.

¶ 48    Jagodowski testified that, from 2008 into 2009, decedent was his neighbor and friend, and they went to casinos together on about a dozen occasions. Jagodowski worked nights and would meet decedent in the morning after work. At about 6 a.m. on January 10, 2009, he went to an Indiana casino with decedent, in decedent's white Hyundai. At one point during their gambling, decedent produced a "big stack of money" about four inches thick, which Jagodowski guessed was about $25,000 to $35,000, and decedent bought about $2,000 in casino chips. Jagodowski had never seen decedent with so much money. At about noon, once decedent lost all of his chips gambling, he and Jagodowski went home, stopping for fuel while in Indiana. Decedent put the remainder of the stack of money under the center console. Jagodowski identified photographs of the white Hyundai he rode in with decedent, casino security video showing decedent's money, gasoline station and tollway video of their trip home, and video of Jagodowski arriving home in decedent's car. On the way home, Jagodowski asked decedent about the money.[5] The last time Jagodowski saw decedent alive was when decedent dropped him at home.

¶ 49    On cross examination, Jagodowski testified that he and decedent did not play high-stakes casino games that last day or earlier, and Jagodowski lost about $500 while he believed decedent lost about $2,000 that last day. Decedent did not say how much cash he had that day.

¶ 50     On redirect examination, Jagodowski reiterated that he had never seen decedent with that much money, adding that he still had about three-quarters of the stack when they left the casino. On recross examination, he reiterated that he did not count decedent's money but guessed from what he could see.

¶ 51    Antoine Silas testified that at the end of 2008, he was an assistant manager for Advantage at its O'Hare Airport location. Advantage's policy was to not let a person rent a car for more than

---

[5] When the State asked for the content of his reply, a hearsay objection was sustained.

28 days. Silas knew Eric Rodriguez, who worked at Advantage's Midway Airport location. Silas knew decedent because they came from the same town and he was related to defendant. Silas knew codefendant through defendant and knew that defendant and decedent were friends. Silas helped defendant rent cars from Advantage, including renting a car near the end of November 2008, but could not recall at trial what kind of car he rented. However, he acknowledged stating in an earlier interview that defendant rented a white Hyundai. Silas no longer worked for Advantage; as of January 11, 2009, the O'Hare location was closed. That morning, but not in the early morning, defendant called Silas and discussed returning the Hyundai, and Silas told him to return it to Rodriguez at the Midway location. Silas called Rodriguez, learned that he was leaving work by 5 p.m., and told defendant to return the car before then. Also, sometime that morning, Silas learned that decedent was found dead in a car trunk. Silas denied telling detectives codefendant's old and new cellphone numbers in March 2009.

¶ 52     On cross examination, Silas testified that he did not recall details of interviews, grand jury testimony, or his statement from 2009 because that was about 10 years before trial. He signed and initialed the statement but did not prepare it.

¶ 53     On redirect examination, Silas testified that he was provided his statement to read before trial but did not finish reading it. Silas could not remember testifying before the grand jury that defendant wanted to keep the car, he rented in late November 2008 for more than 28 days, and Silas arranged with Advantage to do so. The State paid for Silas's flight to Chicago and hotel to attend trial. On recross examination, Silas stated that he was testifying only because he had been subpoenaed.

¶ 54     ASA Karin Swanson testified to interviewing Silas in March 2009 regarding the kidnapping and killing of decedent after informing him of his *Miranda* rights, and he gave a

statement. Swanson had Silas give his statement again and typed out her questions and his answers before he initialed his changes and signed each page. In relevant part, Silas stated that defendant wanted to keep the car he rented in late November 2008 for more than 28 days and Silas arranged with Advantage to do so.

¶ 55   ASA Michelle Spizzirri testified that Silas testified before the grand jury in March 2009. At that time, Silas reiterated his prior statements that defendant wanted to keep the car he rented in late November 2008 for more than 28 days and Silas arranged with Advantage to do so.

¶ 56   Eric Rodriguez testified that early in January 2009, he was a manager at Advantage's Midway location. Advantage was not doing well at the time, and employees were seeking various ways to keep and generate business. Fellow employee Silas told Rodriguez in December 2008, when the O'Hare location closed, that customers would be sent to the Midway location and that they should receive their existing discounts. In addition to discounts, the return date on cars would be "back dated" or recorded as earlier than the car was actually returned. When Rodriguez was told in early January 2009 that the Midway location would close soon, his principal task was to get the rented cars returned.

¶ 57   Defendant was one of the discounted customers expressly mentioned by Silas and had received a significant discount in order to keep him as a customer. He previously rented cars at the Midway location once or twice in December 2008 to January 2009, and he came with other people to pick up the car. Rodriguez recognized the rental contract that he handled for defendant's rental of a white Hyundai on December 12, 2008. The contract reflected that the Hyundai was returned on January 9, 2009, but also shortly before noon on January 12, 2009. Rodriguez testified that the car was actually returned on the later date. On cross examination, he testified that he, not defendant, decided to back-date the return of the Hyundai to January 9.

¶ 58    Randall Weathersby testified that, at the time of trial, he was in jail for contempt of court for ignoring a subpoena to appear in court in this case and that he received no promises regarding his testimony except his release after testifying. He knew both defendants and in 2009 lived in Dolton less than a block from defendant. He knew decedent through defendant and saw decedent multiple times at defendant's home. Weathersby denied receiving a call from defendant on January 9, 2009 and denied saying in a police interview that defendant called him. Weathersby went to defendant's home on January 10, 2009, to watch Saturday night playoff football and saw decedent in front of defendant's home waiting to be picked up by a woman. Decedent asked Weathersby to pick up his rental car at a tollway oasis. Weathersby got the keys from defendant and went to get the Hyundai rental car before the evening's game began, bringing Martha with him.  He returned to defendant's home, stopping on the way to buy snacks, and arrived before the game began. Both defendants and Warren were there to watch the game, Valerie may have been there as well, and Martha was also in the home. Weathersby denied saying in a police interview that Warren was not there. After Weathersby learned that decedent had been killed, he and defendant returned the Hyundai to the rental agency near O'Hare Airport. Weathersby testified that he told the police about decedent asking him to pick up the Hyundai, denied lying to the police about picking up the Hyundai at the oasis, and denied telling police that the belongings removed from the Hyundai were in defendant's home. On cross examination, Weathersby testified that the police interviews referenced in his testimony occurred when he was in custody as a suspect in decedent's death.

¶ 59    Chicago Police Sergeant Brian Forberg testified consistently with Detective Eberle, adding that he and Eberle went to defendant's home after learning from Officer Prohaska that he had been there since about 2 a.m. on January 11, 2009. A month later, Detective Forberg located the Hyundai. The car rental company, Advantage, was going out of business and had placed the

Hyundai for auction. Forberg obtained a warrant to take the Hyundai from the auto auction to a police facility, where forensic investigators photographed and examined it for evidence including DNA and fingerprints. Evidence was taken from inside the car and inventoried, including a fuel receipt from January 10, 2009.

¶ 60    Calvin Miles testified that he had prior convictions for a cannabis trafficking offense in 2004 and aggravated battery in 2006. He was arrested in June 2013, and detectives told him during interrogation that his DNA was found on the steering wheel of a rental Hyundai. When shown photographs of decedent, Manuel, Weathersby, and codefendants, he did not recognize them and still did not know them as of trial. He told the detectives that he had on two earlier occasions rented cars at O'Hare. Another DNA sample was taken from him, and he was released without charges after about two days. At trial, he denied having anything to do with decedent's death.

¶ 61    Former Chicago Police Officer Hubert Rounds testified to being a forensic technician on January 11, 2009, and he investigated the scene at 8957 South Aberdeen where decedent's body was found in the trunk of a blue Cutlass. He saw that the trunk lock was "punched," consistent with the car being stolen and someone opening the trunk without a key. He looked inside the vehicle and saw a blood pool near the rear driver's side. When Rounds looked in the trunk, he saw that decedent had a visible gunshot wound just above his ear, blood was pooling in the trunk, there was a bullet hole in the trunk next to the gas cap, and a cellphone was in the trunk next to decedent's head. Decedent's hand was clutching the trim inside the trunk hatch. Also recovered from the trunk were a screwdriver, duct tape, and bullet fragments. The steering column had been "peeled," which further indicated that the car was stolen, making the vehicle drivable without a key. Rounds photographed and videotaped the scene, and he testified that the photographs and video he was shown at trial, accurately depicted what he saw that day.

¶ 62    The Cutlass was taken to the Medical Examiner with decedent's body still in the trunk. Once the body was removed, Rounds took more photographs that he identified at trial as also accurately depicting what he saw that day, including a bullet hole in the floor of the trunk and coagulated blood in the trunk. Rounds recovered the bullet fragments and cellphone from the trunk and inventoried them. He also found two knit stocking caps in the passenger area of the Cutlass and inventoried them. He swabbed the inside of the car and inventoried those swabs. He recovered and inventoried "[m]iscellaneous papers and napkins," a water bottle, and a "can of new car scent" from inside the passenger area. One napkin had a telephone number written on it. The various items Rounds inventoried were sealed and placed in an evidence locker.

¶ 63    On cross examination, Rounds testified that, except for the first officers on the scene opening the trunk, he believed nothing at the scene was moved before he took his photographs.

¶ 64    Dr. Michael Eckhardt, a forensic pathologist with the Medical Examiner, testified to reviewing the report of decedent's autopsy by a fellow pathologist on January 12, 2009. Decedent's body had multiple gunshot wounds, abrasions, and contusions. Based on the autopsy report, Dr. Eckhardt concluded that decedent died by homicide of multiple gunshot wounds.

¶ 65    On cross examination, Dr. Eckhardt testified that the autopsy did not show in what order the gunshots were inflicted nor when the abrasions and contusions were inflicted in relation to the gunshots. The autopsy also showed that decedent's skull had multiple fractures. Based on his non-gunshot injuries, he may have been beaten, but the injuries could also have been caused another way such as a fall.

¶ 66    The parties stipulated to forensic evidence as follows. DNA swabs were taken from defendants, Weathersby, Miles, and Avendano-Ruiz. Testing revealed the DNA of at least three people from a cap and napkin recovered from inside the blue Cutlass; no one's DNA was

specifically identified as belonging to the DNA found on these items. Decedent's DNA was the only DNA recovered from under his fingernails; DNA recovered from the Hyundai's steering wheel belonged to Miles; and DNA found on the Cutlass was possibly from Avendano-Ruiz but did not belong to defendant, Miles, or decedent. The parties stipulated that the can of new car scent recovered from the Cutlass had no useable fingerprints, nor were any of the fingerprints found inside the Hyundai useable. Finally, the recovered bullet fragments were unsuitable for microscopic analysis and could not be either shown or disproved to have been fired from the same firearm.

¶ 67 Arkansas State Trooper Rockey Rapert testified that he was working drug interdiction at the time of trial but previously worked traffic enforcement on November 10, 2008, when he stopped a car for speeding on the highway north of Memphis. Decedent was driving a white BMW and defendant was the sole passenger. Decedent provided his license, and defendant stated his name but declined to provide identification. When a records search showed that decedent had an outstanding arrest warrant from Georgia for felony larceny, Rapert arrested him. Another record search showed that defendant had a valid Illinois license to drive. Rapert asked defendant to confirm his identity so he could drive the car and, once he showed an Indiana identification card, he was permitted to leave with the car. At some point, Rapert asked if he could search the car, and defendant declined to consent. The stop was video-recorded and Rapert testified that certain video accurately depicted the traffic stop. A portion of the video showing the stop was played at trial. Rapert explained that he told decedent "I don't know if they will come for you or not" because sometimes states would not pay for extradition of arrestees "from long distances away." Rapert allowed decedent to keep his cellphone and make calls while in custody, sitting in the police car.

¶ 68    The court denied a directed verdict or finding as to both defendants. Neither defendant testified at trial, and defendant's counsel rested without presenting evidence.

¶ 69    The jury subsequently found defendant guilty of aggravated kidnaping and first degree murder.

¶ 70                                    C. Posttrial Proceedings

¶ 71    On April 30, 2019, defendant filed a motion for new trial, arguing that the trial evidence was insufficient to convict him beyond a reasonable doubt, and that codefendant's acquittal cast doubt on his guilty verdicts. He also argued that the court erred in admitting evidence of the Arkansas traffic stop as it was irrelevant and cumulative of other evidence that established that defendant and decedent knew each other. In the motion, defense counsel argued that he rendered ineffective assistance by not calling Teresa and Warren Elder as alibi witnesses. While the motion described what defendant believed the testimony of the Elders would be, it did not include any affidavit from the Elders.

¶ 72    Defendant's motion also asserted that the State made various improper closing arguments that inflamed the jury and shifted or disregarded the burden of proof. Defendant contended that after describing the elements of aggravated kidnapping, the prosecutor remarked "I'm not going to go through a laundry list of how it is that the State has proven each and every one of those three propositions because, ladies and gentlemen, a picture is worth a thousand words and that photograph meets our burden than [*sic*] I could ever express myself," referring to a photograph of decedent's body in the trunk of the Cutlass. After describing the elements of first degree murder, the prosecutor remarked "if a picture is worth a thousand words, then I don't even know that we can quantify what this" before playing a recording of the 911 call. The prosecutor also argued that

"[t]he minute that we played that 911 call and Nicole Hughes told you that the voice on that call was Tracy Hughes, our burden was met. Walter Hill was guilty. We didn't need anything else."

¶ 73    At the hearing on defendant's motion, he did not present the Elders as witnesses but argued that counsel was ineffective for not calling them as witnesses for defendant. The State made no arguments at the hearing and filed no response to defendant's motion. The court denied the posttrial motion, finding that the State's closing arguments were not "anything at all close to something that is improper," especially as the jury was properly instructed including being told to disregard stricken evidence and arguments that were not based on evidence.

¶ 74    Following a sentencing hearing, the court sentenced defendant to consecutive prison terms of 25 years for first degree murder and 10 years for aggravated kidnapping, for a total of 35 years' imprisonment. This timely appeal followed.

¶ 75                                    ANALYSIS

¶ 76    On appeal, defendant contends that: (1) the evidence presented at trial was insufficient to find him guilty beyond a reasonable doubt; (2) the trial court erred in admitting evidence of an unrelated traffic stop, and; (3) trial counsel rendered ineffective assistance.

¶ 77                              A. Reasonable Doubt

¶ 78    Defendant contends the evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt because the only evidence that defendant was with decedent, at the time of the crime, was presented in two 911 calls where decedent made vague statements. Additionally, the State's other evidence disproves its own theory of how the crimes occurred when Officer Prohaska testified that he arrived at defendant's home in a short period of time after the time that decedent was killed and talked to him. Defendant contends it is implausible for him to complete the crime of kidnapping and murder, abandon the vehicle that decedent was shot in, fit six people

in one car, and drop everyone off in a 21-minute window without raising any suspicion while being interviewed by the police.

¶ 79    The State contends that the 911 calls made by decedent were not vague and provided specific details that support defendant's convictions. Moreover, defendant displayed a motive when the evidence showed that a large sum of money went missing. Evidence also showed that defendant began to make arrangements to return the rented Hyundai that decedent was driving before he was notified by the police of decedent's death. The State contends that while it may be exactly unclear when and where decedent was killed, it does not matter because defendant's presence was not needed to convict him under the theory of felony murder.

¶ 80    When evaluating a claim of the sufficiency of evidence, "the relevant question on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Williams*, 383 Ill. App. 3d 596, 637 (2008). Taking the evidence in the light most favorable to the State includes making all reasonable inferences from the evidence in the State's favor. *People v. Eubanks,* 2019 IL 123525, ¶ 95. It is the responsibility of the trier of fact to weigh, resolve conflicts in, and draw reasonable inferences from the evidence. *Jackson*, 2020 IL 124112, ¶ 64. Therefore, we do not retry a defendant or substitute our judgment for that of the trier of fact regarding witness credibility or the weight of evidence. *Id.*

¶ 81    The trier of fact is not required to disregard inferences that flow normally from the evidence, nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *Id.* ¶ 70. In other words, the State need not disprove or rule out all possible factual scenarios. *People v. Newton*, 2018 IL 122958, ¶ 27. The trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances if the evidence as a whole

satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *Jackson*, 2020 IL 124112, ¶ 70. Accordingly, a conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Id*. ¶ 64.

¶ 82    Viewing the evidence in the light most favorable to the State, we find the State's presentation of the 911 tape could permit a rational trier of fact to conclude that defendant was guilty of first degree murder and aggravated kidnapping. In this case, the 911 call made by decedent was properly admitted into evidence by the State as a dying declaration, and neither party disputes this. The 911 tape recorded the decedent repeatedly stating that defendant was involved in his kidnapping and that he, the decedent, was being shot. We understand that the State did not present evidence that corroborated the statements made by the decedent, nor did they present any physical evidence that tied defendant to the crime. Indeed, defendant's presence at his home was unusual since it was within a short period of time after the last call was made to 911 by the decedent. The State acknowledges these holes and argues that while defendant indicted for multiple counts of murder, he was convicted under the theory of felony murder.  Under felony murder, defendant is not required to be the sole or immediate cause of death. *People v. Derr,* 316 Ill. App. 3d 272, 276 (2000). Additionally, the offense of felony murder does not require the State to prove the intent to kill. *People v. Davison,* 236 Ill. 2d 232, 239 (2010). Although, the evidence at trial was not overwhelming and at times redundant, it was sufficient. This court has held that a dying declaration is "singly sufficient to convict" a defendant of first degree murder. *People v. Hatchett*, 397 Ill. App. 3d 495, 489 (2009).  As a result of the admission of the dying declaration to the 911 operator that spanned over the course of several phone calls, the State was able to meet its burden to establish defendant's guilt.

¶ 83                                B. Arkansas Traffic Stop

¶ 84    Defendant contends that the trial court erred in not granting his *motion in limine* to exclude video and testimonial evidence regarding the Arkansas traffic stop. Defendant contends that the stop was only admitted to imply that defendant was engaged in illegal activity. Admitting the stop resulted in the jury hearing Rapert state that his unit of assignment at the time of trial was the "drug interdiction" unit, that he worked as a canine handler, and that defendant refused to permit a search of his vehicle. Defendant argues that the protection of his constitutional right to refuse the search outweighed any probative value of that evidence.

¶ 85    The State, however, contends that the defense has forfeited its objection to the specific testimony of Rapert's working in the "drug interdiction" unit and as a canine handler at the time of trial. Even if defendant's claim was preserved, the State contends that the 911 call was so sufficient to secure his conviction that defendant would be unable to establish he was prejudiced. The State further contends that the evidence was relevant because it tended to show that defendant and decedent were engaged in an illegal cross-country business trip. The State notes that the presentation of numerous phones, large amounts of cash, and rental cars demonstrate that an illegal business existed.

¶ 86    As a preliminary matter, the State contends that defendant has forfeited his objection to Rapert's testimony that he worked in the "drug interdiction" unit and as a canine handler, because defendant failed to object to the specific testimony at trial. We have held that to preserve an issue for review, a defendant must: (1) raise the issue in either a motion *in limine* or a contemporaneous trial objection, and (2) include it in the posttrial motion. *People v. Denson*, 2014 IL 116231, ¶ 11. Defendant raised the issue of the Arkansas traffic stop in a motion *in limine* prior to trial and continued to preserve that issue by raising it in his posttrial motion. We find that the objection to the entire traffic stop encompassed any and all testimony that Rapert could give. Rapert is only

relevant if the traffic stop is admitted. This court is not persuaded that defendant was required to make a separate objection to each possible facet of evidence emanating from the whole: in this case the facet being Rapert's work assignment at the time of trial and the whole being the traffic stop. Defendant did all that was required to preserve this issue on appeal. The burden that the State is seeking to place on defendant is not consistent with what we have held. In fact, we have held that requiring contemporaneous trial objections was required, but solely for civil cases. *Id.* at ¶ 19. The case at hand is not civil; it is criminal in nature and therefore contemporaneous trial objections were not needed. Thus, defendant has rightfully preserved this issue on appeal.

¶ 87    At trial, the evidence showed that defendant and decedent were pulled over for speeding. The traffic stop resulted in decedent being arrested because of a felony warrant from Georgia. Rapert testified that he worked "drug interdiction," at the time of the trial, he worked as a canine handler, and that defendant was asked if he would permit a search of his car, but he declined.

¶ 88    Defendant contends that the probative value of the traffic stop evidence was outweighed by how prejudicial the evidence was to defendant. Evidence is generally admissible if it is relevant to an issue in dispute and its probative value does not substantially outweigh its prejudicial effect. *People v. Johnson*, 208 Ill. 2d 53, 102 (2003). The trial judge must deny the motion *in limine* if the rules of evidence do not require the exclusion of the disputed material. *People v. Holman*, 257 Ill. App. 3d 1031, 1033 (1994). However, if the disputed material should be excluded, the trial court has the discretion to either grant or deny the motion. *Id.* The trial court is responsible for determining the admissibility of evidence, and a reviewing court will not disturb the trial court's ruling on a motion *in limine* absent an abuse of discretion. *People v. Kirchner*, 194 Ill. 2d 502, 539 (2000). "A trial court abuses its discretion where its decision is arbitrary, fanciful, or unreasonable,

or where no reasonable person would take the trial court's view." *People v. Atherton*, 406 Ill. App. 3d 598, 615 (2010).

¶ 89 The prejudicial effect of evidence means that the evidence at issue will in some way cast a negative light upon the defendant for reasons that have nothing to do with the case on trial. *People v. Lynn*, 388 Ill. App. 3d 272, 278 (2009). Federally, the United States Supreme Court has held that permitting the prosecution during trial to use a person's right to remain silent at the time of arrest "does not comport with due process." *Doyle v. Ohio*, 426 U.S. 610, 619 (1976). Similarly, Illinois courts have consistently held that a defendant is denied a fair trial when their exercise of the right to be free from search and seizures is admitted into evidence. See *People v. Warner*, 121 Ill. App. 3d 322, 326-27 (1984); *People v. Ealy*, 2015 IL App (2d) 131106, ¶ 51. In *Ealy*, the State introduced evidence that the defendant refused to give a DNA sample to the police. *Id*. at ¶ 13. On appeal, this court found that the admission of that evidence denied the defendant the right to a fair trial. *Id.* at ¶ 50. The court found, "[t]he State may not introduce evidence that the accused exercised his constitutional right to be free from unreasonable searches and seizures, because the prejudicial effect substantially outweighs the probative value of allowing the jury to infer the accused's consciousness of guilt from his exercise of his rights." *Id.*

¶ 90 In *Warner*, the State introduced evidence showing that the defendant refused to comply with the police request to state "hey you" in a lineup. *Warner*, 121 Ill. App. 3d at 324. On appeal, this court found that testimony of the defendant's refusal to participate in a voice identification test should not have been admitted and warranted a new trial. *Id.* at 327.

¶ 91 The State concedes that the purpose of admitting evidence of the traffic stop was to demonstrate that defendant and decedent were involved in an illegal cross country trip. Defendant's motion *in limine* argued that the introduction of the stop would confuse the jury into

believing defendant was engaging in illegal conduct when there was no such conduct. He also alleged that the prejudicial effect outweighed the probative value because showing that defendant and decedent had a relationship was cumulative. During the hearing for the motion *in limine*, defendant objected to the admission of the stop based on a concern that the State would use the stop to further its theory that defendant and decedent were part of an illegal cross country trip. Defendant specifically noted that they were concerned that the State would attempt to show that the vehicle at issue was a car rental, which they suspected would further the State's theory that they were involved in illegal conduct. The State responded that they had no intention of showing that the car was a rental, and consequently the trial court denied the motion. In denying defendant's motion *in limine*, the trial court ruled that the State could place the decedent and defendant together, and that was all it thought the State wanted to demonstrate with that evidence. The trial court assured defendant's that the State was not intending to present evidence of a rental car. In the motion for new trial, defendant re-raised his argument that the evidence was cumulative in showing the relationship between defendant and decedent. Further, defendant argued that the evidence was not relevant to his case and could only serve to mislead the jury.

¶ 92    "Evidence is considered cumulative when it adds nothing to what was already known to the jury." *People v. Maya*, 2017 Ill. App (3d) 150079, ¶ 69. We agree with defendant that the evidence of the stop was cumulative of defendant and decedent's relationship; the prejudicial effect outweighed the probative value. *Johnson*, 208 Ill. 2d at 102. The stop occurred months prior to decedent's death and had no relevance to the case other than to establish that they knew each other which could have been established with other evidence.  In fact, the State introduced several witnesses who testified that they knew that defendant and decedent had a close relationship; thus, making use of the traffic stop as evidence of the relationship unnecessary.  The introduction of the

stop had a prejudicial effect because it cast a negative light on defendant for a reason that had nothing to do with the case. *Lynn*, 388 Ill. App. at 278. At the time of the stop, defendant exercised his constitutional right to decline to have his vehicle searched. This refusal to allow a search of his vehicle as decedent was taken into custody by a state trooper, who at the time of the trial was assigned to the "drug interdiction" unit, gives the implication that defendant had something to hide that was criminal in nature. That implied criminality can lend itself to the case at hand and unjustifiably taint it. This is evidence that the State cannot introduce without creating a prejudicial effect of allowing the jury to infer defendant's consciousness of guilt from his exercise of his right to be free from unreasonable searches. *Ealy*, 2015 IL App (2d) 131106, ¶ 50. In light of our finding that the introduction of this evidence was more prejudicial than probative, we must consequently find that the trial court's decision to admit the evidence was unreasonable and an abuse of discretion thereby warranting a new trial.

¶ 93   Having reversed defendant's conviction, we need not address the remaining issue of ineffective assistance of counsel.

¶ 94                                 CONCLUSION

¶ 95   In conclusion, we find that the 911 tape that provided decedent's dying declaration was sufficient to find defendant guilty beyond a reasonable doubt. However, such declaration cannot succeed a constitutional violation where the admission of evidence is more prejudicial than probative. Thus, for the foregoing reasons, we reverse the trial court's judgment and remand for a new trial.

¶ 96   Reversed and remanded.

¶ 97   JUSTICE HARRIS, dissenting:

¶ 98    I respectfully disagree with my colleagues that the trial court abused its discretion in admitting evidence of the Arkansas traffic stop. I agree that the traffic stop evidence was cumulative, as the trial court admitted it as evidence that defendant and decedent Hughes knew each other but there was other evidence to that effect. However, I disagree with my colleagues that the evidence was more prejudicial than probative. I believe the traffic stop evidence did very little to advance the State's case but also did very little to set back defendant's case. Therefore, I cannot conclude that admitting the traffic stop evidence was arbitrary, fanciful, or unreasonable, or that no reasonable person could agree with that decision.

¶ 99    Firstly, my colleagues note that the "State concedes that the purpose of admitting evidence of the traffic stop was to demonstrate that defendant and decedent were involved in an illegal cross country trip." *Supra* ¶ 91. However, whatever the purpose of the State seeking to admit the traffic stop evidence during motions *in limine*, at trial the State did not introduce evidence of marijuana trafficking by defendant despite having a ruling *in limine* that it could introduce such evidence to show motive. The State presented motive evidence that defendant was missing a large sum of money and Hughes suddenly had a large sum of money, but the source of that money was not addressed in the trial evidence. In other words, the jury heard the evidence the State actually presented at trial rather than the evidence the State believed it was going to present at trial.

¶ 100   In that light, the traffic stop evidence was unremarkable as it related to defendant. Defendant and Hughes were stopped for speeding in Arkansas north of Memphis by Trooper Rapert, who was on traffic enforcement duty that day. While Hughes was arrested on a felony warrant for larceny – not a drug or marijuana offense – a search of defendant's name showed only that he had a valid driver's license. Rapert allowed defendant to drive onward once he proved his identity. Separate from the traffic stop evidence, the jury heard evidence that defendant visited

relatives in Mississippi, Hughes was from Mississippi, and defendant and Hughes had taken another trip to Tennessee to pick up Hughes's son. I note that Mississippi is just south of Tennessee, with Memphis being between Mississippi and where Rapert stopped defendant and Hughes in Tennessee. In that context for defendant and Hughes traveling together in Arkansas, the traffic stop evidence did not "demonstrate that defendant and decedent were involved in an illegal cross country trip," regardless of why the State *wanted* to introduce that evidence.

¶ 101    Secondly, my colleagues echo defendant's briefs in unduly emphasizing that Rapert testified to working drug interdiction at the time of trial in 2019. However, Rapert testified that he was working traffic enforcement on the November 2008 day he stopped the vehicle containing defendant and Hughes for speeding. Asking Rapert as background at the beginning of his testimony what his present assignment was does not strike me as either unusual or prejudicial so long as it was made clear, as it was, that he was working traffic enforcement on the day of the stop. By the logic of defendant and the majority, had Rapert replied that he was on counter-terrorism duty in 2019, it would imply he stopped defendant and Hughes over 10 years earlier as potential terrorists despite his testimony that he was working traffic enforcement on the day of the stop.

¶ 102    Lastly, defendant and my colleagues emphasize Rapert's testimony that he asked defendant for consent to search his vehicle, but he declined. The key case on this point is *Ealy*, which the majority quotes (*supra* ¶ 89) for the proposition that the "State may not introduce evidence that the accused exercised his constitutional right to be free from unreasonable searches and seizures, because the prejudicial effect substantially outweighs the probative value of allowing the jury to infer the accused's consciousness of guilt from his exercise of his rights" *Ealy*, 2015 IL App (2d) 131106, ¶ 51. Unlike the *Ealy* court and the majority here, I am reluctant to derive a categorical rule from an analysis of whether the probative effect of a given piece of evidence is substantially

outweighed by its prejudicial effect (*id.* ¶¶ 44-50), which inherently involves balancing probative and prejudicial effects under the facts and circumstances of the case. The *Ealy* defendant refused to consent to DNA testing that could have placed him at the scene of the crime of which he was convicted. *Id.* ¶¶ 5, 12-14. The *Ealy* court concluded "that the admission of defendant's refusal to consent to DNA testing was an abuse of discretion because it permitted the jury to infer consciousness of guilt from defendant's exercise of his rights." *Id.* ¶ 48. However, it does not follow that the admission of such evidence will always or inherently have that effect.

¶ 103    Here, the consent to search that defendant refused was collateral, indeed tangential, to the charges against him. Unlike the defendant in *Ealy*, defendant's consciousness of guilt of the kidnapping and murder of Hughes could not be inferred from his refusal to consent to a search of his car months before those offenses occurred. I consider the evidence that defendant did not consent to a search of his car to be of one piece with the traffic stop evidence generally: it did little if anything to advance the State's case but also did little if any harm to defendant's case.

¶ 104    Accordingly, I would find no abuse of discretion in the admission of the traffic stop evidence and would affirm the judgment of the circuit court.